[Crim. No. 5767.   In Bank.   Dec. 9, 1955.]

THE PEOPLE, Appellant, v. JAMES MARTIN,
Respondent.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, S. Ernest Roll, District Attorney (Los Angeles), Jere J. Sullivan and Lewis Watnick, Deputy District Attorneys, for Appellant.

John J. Bradley and Max Solomon for Respondent.

A. L. Wirin and Fred Okrand as Amici Curiae on behalf of Respondent.

TRAYNOR, J.—By information defendant was charged with two counts of horse-race bookmaking (Pen. Code, § 337a, subd. 1) and two counts of keeping and occupying premises for the purposes of such bookmaking. (Pen. Code, § 337a, subd. 2.) The trial court granted defendant's motion to set the information aside (see Pen. Code, § 995) on the

ground that all of the evidence against him had been obtained by illegal searches and seizures in violation of his constitutional rights. The People appeal.

Two of the counts were based on defendant's activities that were discovered by the arresting officers on April 20, 1955, at an office on Ventura Boulevard in Los Angeles. About 11:30 in the morning three police officers went to the premises, a small one-story office building. One testified that on arriving, "I went to the front door of the office at this address and I looked through the door through a mail chute into the door into the small office. At first I didn't see anything. The room appeared to be empty. I knocked on the door and nobody answered. Nobody came to the door or answered; so I looked through again and I could see the defendant inside the room. He was on the telephone standing off to the left from the door using the telephone, at which time I knocked again and identified myself, and the defendant came and opened the door and let the three of us in." Inside the room the officers found two small tables, two telephones, two blackboards, a box of chalk, a wet rag, and a scratch sheet for the day. Part of one of the blackboards was wet as if it had just been wiped. There were also two 2-by-12 planks on the floor near the door. The officers stayed in the room for approximately an hour and answered the telephones, which rang frequently. Telephone callers, who identified themselves by numbers, called in bets on various races during this period. As an expert on the practice of bookmakers in Los Angeles County, one of the officers testified that in his opinion the room was a relay spot, a place where either bettors or the handbooks that take bets from bettors telephone their bets. At a relay spot the bets are either recorded temporarily until they can be telephoned on to a "phone spot or office" or are passed on directly to the phone spot by mechanically relaying the telephone calls.

The other two counts were based on defendant's activities that were discovered by the arresting officers six days later at another small office building on Ventura Boulevard. The same three officers went to the premises about 11:30 in the morning. While they were looking the place over, a woman came from a house in the rear, questioned them, and they identified themselves. After talking to her the officers looked through the rear window of the building. One of them testified: "In the inside I could see two two-by-twelve planks barricading the door. I could see a blackboard laying on the floor, a box of chalk on it, a wet rag or a rag. I opened

the window. I smelled cigarette smoke in the room. I could see what turned out to be the defendant moving around inside the room. I identified myself, called for the defendant to open the door, which he didn't do, so I entered through the window. . . . In the front room I found the defendant, two telephones on a card table, a pile of warm ashes in the corner.'' While the officers were present the phones rang frequently, and although many of the callers hung up when the officers answered, one attempted to place bets. It was the officer's opinion that this room was also a relay spot.

At the time of the first arrest defendant told the officers that a man had offered him $2.00 to go in and watch the place in case any salesmen came around, and at the time of the second arrest defendant told the officers that a man on Ventura Boulevard had offered him a day's wages to sit in the place. The officers did not have a search warrant on either occasion.

■ The attorney general contends that since defendant disclaimed any interest in the premises searched and the property seized, his constitutional rights could not have been violated and that therefore he has no standing to challenge the legality of the searches and seizures. (See *Casey* v. *United States*, 191 F.2d 1, 3; *Mello* v. *United States*, 66 F.2d 135, 136; *Connolly* v. *Medalie*, 58 F.2d 629, 630.) We cannot agree with this contention.

It is true that in *Goldstein* v. *United States*, 316 U.S. 114 [62 S.Ct. 1000, 86 L.Ed. 1312], the United States Supreme Court recognized that the rule is well established in the lower federal courts that only those whose constitutional rights have been violated may object to the introduction of illegally obtained evidence against them. In the light of that rule it held that the federal wire-tapping statute should not be interpreted as forbidding the use of wire-tap evidence against a person not a party to the conversation. It was careful to point out, however, that it had never decided that the rule applied in the lower federal courts with respect to unconstitutionally obtained evidence was correct. There are several United States Supreme Court decisions cited below, however, that are logically inconsistent with the rule applied in the lower federal courts, and it is impossible to reconcile that rule with the reasons that compel the exclusion of the evidence.

■ Thus, the rule of the lower federal courts is based on the theory that the evidence is excluded to provide a remedy for a wrong done to the defendant, and that accordingly, if the defendant has not been wronged he is entitled to no

remedy. (*Connolly* v. *Medalie, supra,* 58 F.2d 629, 630.) In adopting the exclusionary rule, however, this court recognized that it could not be justified on that theory (*People* v. *Cahan,* 44 Cal.2d 434, 443 [282 P.2d 905]), and based its decision on the ground that "other remedies have completely failed to secure compliance with the constitutional provisions on the part of police officers with the attendant result that the courts under the old rule have been constantly required to participate in, and in effect condone, the lawless activity of law enforcement officers." (44 Cal.2d at 445.)

This result occurs whenever the government is allowed to profit by its own wrong by basing a conviction on illegally obtained evidence, and if law enforcement officers are allowed to evade the exclusionary rule by obtaining evidence in violation of the rights of third parties, its deterrent effect is to that extent nullified. Moreover, such a limitation virtually invites law enforcement officers to violate the rights of third parties and to trade the escape of a criminal whose rights are violated for the conviction of others by the use of the evidence illegally obtained against them.

The United States Supreme Court has clearly recognized that the purpose of the exclusionary rule is not to provide redress or punishment for a past wrong, but to deter lawless enforcement of the law. "The Government cannot violate the Fourth Amendment . . . and use the fruits of such unlawful conduct to secure a conviction. [Citation.] Nor can the Government make indirect use of such evidence for its case [citation], or support a conviction on evidence obtained through leads from the unlawfully obtained evidence. [Citation.] All these methods are outlawed, and convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men." (*Walder* v. *United States,* 347 U.S. 62, 64-65 [74 S.Ct. 354, 98 L.Ed. 503] ; see also *United States* v. *Mitchell,* 322 U.S. 65, 70-71 [64 S.Ct. 896, 88 L.Ed. 1140].) In *McDonald* v. *United States,* 335 U.S. 451, 456 [69 S.Ct. 191, 93 L.Ed. 153], it gave effect to this policy by reversing the conviction of both defendants although only the rights of one had been violated. It pointed out that had the evidence been returned to the defendant from whom it was illegally taken, it would not have been available for use against the other defendant, and held therefore that its admission was prejudicial as to both. (See also *Anderson* v. *United States,* 318 U.S. 350, 356-357 [63 S.Ct. 599, 87 L.Ed. 829] ; *Silverthorne Lbr. Co.* v. *United States,* 251 U.S. 385, 392 [40 S.Ct.

182, 64 L.Ed. 319, 24 A.L.R. 1426] ; *United States* v. *Thomson,*
113 F.2d 643, 646 [129 A.L.R. 1291] ; *United States* v. *Haupt*
136 F.2d 661, 672.) �damg It is true that in the McDonald
case a pretrial motion for the return of the evidence by the
defendant whose rights were violated had been erroneously
denied.   There is no basis for concluding, however, that a
defendant whose rights have not been violated should have
standing to challenge a pretrial ruling against his codefendant,
if he has no standing to challenge the legality of the original
seizure.   In either situation his right to object to the use
of the evidence must rest, not on a violation of his own
constitutional rights, but on the ground that the government
must not be allowed to profit by its own wrong and thus
encouraged in the lawless enforcement of the law.

▇ Since all of the reasons that compelled us to adopt the
exclusionary rule are applicable whenever evidence is ob-
tained in violation of constitutional guarantees, such evidence
is inadmissible whether or not it was obtained in violation of
the particular defendant's constitutional rights.   Accord-
ingly, it must be determined whether the evidence was illegally
obtained in this case.

Defendant contends that on each occasion the officers'
entry into the premises was illegal and therefore the officers
cannot justify the arrests, searches, or seizures by any obser-
vations made by them thereafter.   (See *Johnson* v. *United
States,* 333 U.S. 10, 16-17 [68 S.Ct. 367, 92 L.Ed. 436].)

▇ On the first occasion one of the officers looked through
a mail chute in the door and determined that defendant was
inside.   He then knocked and identified himself, "and the
defendant came and opened the door and let the three of us
in."   In this case, as in *People* v. *Michael, ante,* p. 751 [290
P.2d 852], there is no evidence that the officers demanded
that the door be opened or that they be admitted, and as we
pointed out in that case, "it is not unreasonable for officers
to seek interviews with suspects or witnesses or to call upon
them at their homes for such purposes." ▇ Similarly, it
is not unreasonable for officers to make such calls at business
premises, and on the record before us, the officer's testimony
before the magistrate supports the conclusion that the entry
into the office was made with defendant's consent. ▇ Once
the officers had gained admittance to the office, they had
reasonable cause to believe that a public offense was being
committed by defendant in their presence.   The telephones,
tables, blackboards, chalk, scratch sheet, and the wet rag are

all innocent when considered separately. Together, however, they constituted the usual paraphernalia of a "relay spot," and the officers were reasonably justified in concluding that defendant was occupying the premises for the purposes of bookmaking in violation of Penal Code, section 337a, subd. 2. ■ Defendant's arrest was therefore lawful under subdivision 1 of Penal Code, section 836 (*Coverstone* v. *Davies*, 38 Cal.2d 315, 320-321 [239 P.2d 876], and cases cited), and it is immaterial that the seizure of the paraphernalia used in the commission of the crime may have preceded rather than followed the arrest. (*People* v. *Simon*, *ante*, p. 645 [290 P.2d 531].)

■ On the second occasion, six days later, the same officers looked through the rear window of another small office building. A blackboard, chalk, and a rag, were visible, and the door was barricaded by two 2-by-12 planks. Although it does not appear that the officers observed telephones or a scratch sheet from the window, the presence of the other paraphernalia together with barricades similar to those found at the time of the first arrest justified their conclusion that these premises were also a "relay spot." Moreover, since the barricades were in place, they could reasonably infer that someone was present and that an offense was therefore being committed in their presence.

■ Since looking through a window does not constitute an unreasonable search (*Safarik* v. *United States*, 62 F.2d 892, 895; *Smith* v. *United States*, 2 F.2d 715, 716; *United States* v. *Strickland*, 62 F.Supp. 468, 471; *State* v. *Hawkins*, 362 Mo. 152 [240 S.W.2d 688, 692-693]; *People* v. *Exum*, 382 Ill. 204 [47 N.E.2d 56, 59]; see also *United States* v. *Lee*, 274 U.S. 559, 563 [47 S.Ct. 746, 71 L.Ed. 1202]), the officers were entitled to act upon what they saw and arrest defendant. (Pen. Code, § 836, subd. 1; *Coverstone* v. *Davies*, *supra*, 38 Cal.2d 315, 320-321.)

■ Defendant contends, however, that the officer's entry through the window was unlawful and that any evidence obtained thereafter is therefore inadmissible. Section 844 of the Penal Code provides that "To make an arrest, a private person, if the offense be a felony, and in all cases a peace-officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired." This section was substantially com-

plied with in this case. The officer identified himself and asked defendant to open the door. Since he had arrested defendant six days before under similar circumstances and since defendant appeared to be committing an offense in his presence, "the purpose for which admittance [was] desired" was reasonably apparent, and it was unnecessary expressly to inform defendant of the intention to make an arrest. (*People* v. *Pool,* 27 Cal. 572, 576-580; *People* v. *Young,* 136 Cal.App. 699, 705 [29 P.2d 440]; *Allen* v. *McCoy,* 135 Cal.App. 500, 508-509 [27 P.2d 423, 28 P.2d 56]; Pen. Code, § 841; see Rest., Torts, § 128, com. f.) ▮ Moreover, even if it is assumed that raising the window was unlawful, on the ground that it occurred before the request for admittance, such illegality, if any, is immaterial in this case. Before the window was opened the officers had grounds for making an arrest, and once their demand for admittance was refused, they were entitled to enter through the window. ▮ Under these circumstances, the fact that one of the officers opened the window and then spoke to defendant rather than shouting through it or the door, was entirely unrelated and collateral to the entry and to the securing of the evidence to which defendant objects, and it could not therefore render that evidence inadmissible. (*People* v. *Boyles, ante,* p. 652 [290 P.2d 535], and cases cited.)

The order is reversed.

Gibson, C. J., Shenk, J., Carter, J., Schauer, J., Spence, J., and McComb, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.