[Crim. No. 5456. Second Dist., Div. Three. Nov. 13, 1956.]

THE PEOPLE, Respondent, v. JOSEPH E. JAGER et al., Appellants.

Kenny & Morris and Eleanor V. Jackson for Appellants.

Edmund G. Brown, Attorney General, and Robert S. Rose, Deputy Attorney General, for Respondent.

SHINN, P. J.—Joseph E. Jager, George Zachario and James F. Stewart were charged with burglary, two counts, in that they wilfully entered the offices of Edgar Grollnek, a wholesale jeweler, on January 16 and January 27, 1954, with the intent to commit theft therein. A third count accused them of conspiracy to violate section 484 of the Penal Code (theft). The information set out four overt acts allegedly committed in furtherance of the conspiracy. Trial was to a jury. Each defendant was represented at the trial by separate counsel, who do not represent them on this appeal. They were convicted on each of the three counts and sentenced to eight months in the county jail, the terms to be served concurrently. They appeal from the judgment, the denial of their

motion in arrest of judgment, and the denial of their motion for a new trial.

There was evidence of the following facts. Edgar Grollnek was a wholesale diamond jeweler with offices in suite 1017-1018 of the Loew's State Building in downtown Los Angeles. The safe in 1018, his private office, contained about $25,000 worth of jewelry in January 1954. Suite 1015-1016 was immediately adjacent to Grollnek's offices. It was occupied by the James Stewart Detective Agency. Room 1016 was Stewart's office. It was separated from Grollnek's private office by a door which opened inwards into Stewart's office and could be locked, on Grollnek's side, by means of a double dead-bolt lock. There was some dispute in the evidence as to whether the door had a knob. Zachario was employed by Stewart as a private investigator. Jager, Stewart's brother-in-law, was a part-time employee of the agency.

Thomas Curren was the chief witness for the People. The following is the substance of his testimony. He operated a locksmith's shop in Pasadena. He testified that another locksmith, Ed Nixon, introduced him to Zachario on January 8, 1954. He picked a lock for Zachario in connection with a case Zachario was investigating. On January 16th Zachario telephoned Curren and asked him if Nixon had talked to him. Curren said that he had and Zachario asked Curren if he would be interested. Curren replied that he did not know. Zachario said that he would come out to the shop to talk to Curren. Curren then telephoned the Pasadena police, told them of the call, and two officers were dispatched to his shop. Zachario arrived at about 3:30 p. m. and asked Curren if he could open a safe. He told Curren that the safe contained between $20,000 and $100,000 worth of jewelry and that if the jewelry were stolen, Curren would get a share of the proceeds. Curren said he would have to see the safe and agreed to take a look at it. After this conversation Curren informed the two officers that he was going to Los Angeles with Zachario and they counseled him to go ahead. Zachario introduced Curren to Jager and the three men drove to Los Angeles where they met Stewart at the detective agency. Stewart asked Curren if he thought he could open Grollnek's safe and Curren replied that he would have to see. Stewart suggested that Curren work on the safe, and after Stewart had dialed the telephone number in Grollnek's office to see if any one was there, Jager slipped a pocket knife between the latch of the door connecting Stewart's office with Grollnek's

office. Curren and Jager entered 1018 and Curren manipulated the dial of the safe. He copied the model number from the safe dial and tried some combinations, without success. Before the men left, Jager and Zachario removed fingerprints with handkerchiefs. The four men left the building at about 5 p. m. and Jager drove the others to Pasadena. On the way Stewart asked Curren if he could do anything with the safe. Curren said that he would have to check his books. When they separated Stewart told Curren that he would be called in a few days. Curren then told the Pasadena police what had happened and promised to inform them of future developments. Curren testified that Stewart telephoned him on January 27th and asked him to come to the detective agency that evening. He relayed this to the Los Angeles police, who were now in charge of the case. They instructed him to go along. At about 6 p. m. he took a bag of miscellaneous tools from his shop and was picked up by Jager who drove him to the Loew's State Building. They met Stewart at the agency and Curren copied some numbers out of a safe manual. Zachario arrived a few minutes later and the four men played poker until about 11 p. m. Since the building was quiet, they decided to crack the safe. Jager opened the door leading in to Grollnek's private office and both he and Curren used the safe manual in an attempt to open the safe with various series of numbers. They were again unsuccessful. Curren and defendants left the building before midnight. Stewart told Curren to leave his tool bag in his office as some one might see it. Curren complied with this request. Curren telephoned the police the next day and several times afterwards telephoned the agency asking for the return of his tools.

On January 20th, four days after the first attempt to crack Grollnek's safe, Officer Bishonden obtained a key to room 1021 from Arthur Kempner, superintendent of the Loew's State Building. He and four other officers entered the building after midnight on January 22d. Officer Lee picked the lock of 1018 and installed a microphone in a wooden molding about four feet from the top of the safe. Lee and Bishonden ran a wire from the microphone to room 1021. At about 5 p. m. on January 27th, after being alerted by Curren, Officers Eggenweiler, Bishonden and Lauritzen entered 1021. They remained there until after midnight, except for a few inspection trips down the hall. They connected a Revere tape recorder to the wire running from Grollnek's office. Until 11 p. m. they heard mostly traffic noises. Between 11 and 11:45

p. m., the lights in the detective agency were on and the officers heard continuous noises over the tape recorder. They heard male voices calling out numbers and heard pounding and scratching noises. Some one called out "Hey, Joe" and "This is an old son of a bitch." They heard no female voices. The officers left shortly after midnight. At that time the agency's offices were dark and apparently unoccupied. The tape recording was introduced into evidence and played to the jury.

On March 10, 1954, Officers Bishonden and Lauritzen entered the detective agency. Bishonden spoke to Zachario in the outer officer and walked into Stewart's office. He searched the room and discovered a brown leather tool bag in a closet behind a partition. The bag was introduced into evidence over defendants' objection that it was irrelevant and immaterial. Stewart and Zachario were then placed under arrest. Jager was arrested the same day.

Defendants, testifying in their own behalf, denied the conspiracy and denied having tried to open the safe. Zachario testified that Curren had picked the lock of a place defendants had under surveillance and that he and Jager invited Curren to the agency on January 16th to meet Stewart. Curren met Mr. and Mrs. Stewart and left soon after. On the evening of January 27th, Curren and defendants played penny ante in Stewart's office while Mrs. Stewart was doing some accounting work. They were drinking bourbon and Zachario testified that Curren became drunk and argumentative. Curren happened to have his tool bag with him that evening and set it down in the outer office. Jager, Stewart and Mrs. Stewart generally corroborated Zachario's testimony.

Defendants first contend that the verdict was contrary to undisputed testimony which demonstrated that it was impossible for them to have entered Grollnek's private office on January 16th and January 27th in the manner described by Curren. Grollnek and Glenn M. Smith, an expert witness called by the defense, testified that the connecting door could only be locked when the dead-bolt was in place. Smith stated that if the bolt was in place the lock could not be picked from Stewart's side. Therefore, defendants argue, Jager could not have manipulated the lock and Curren's testimony was unquestionably false.

We do not agree with the contention that Curren's testimony regarding the entries was so inherently improbable as to amount to no evidence at all. Defendants' reasoning is based

upon the supposition that the door was bolted on both occasions. But the evidence does not compel the acceptance of this premise. Grollnek testified that he did not pay particular attention to the door and checked it at infrequent intervals. He was not in his office on January 16th and when he went home on January 15th he did not check the door. He assumed that it was locked. He was not asked whether he checked the door on January 27th to see if it was locked. There was no positive evidence that the connecting door was locked on either day. The jury could have inferred that it was locked and it could have inferred, with equal justification, that it was not. Smith, defendants' expert, testified that if the deadbolt was not locked, the door could have been opened by slipping a small object between the door and the door-jamb and he demonstrated the procedure to the jury. It does not appear as a matter of law that the door could not have been opened from Stewart's room. Therefore we cannot conclude that Curren's testimony was inherently incredible or that the jury had no rational basis for believing that Jager opened the door with a pocket knife.

Defendants' next contention is that the tool bag and tape recording were erroneously admitted into evidence over their objections that they were illegally obtained. This ground of objection was not asserted at the trial. It was first raised on the motion for a new trial. ▇ But since this case was tried before the decision in *People* v. *Cahan* (44 Cal.2d 434 [282 P.2d 905]), the contention may be considered although no objection was made. (*People* v. *Kitchens,* 46 Cal.2d 260, 262-263 [294 P.2d 17].)

Defendants argue with respect to the tape recording that the officers committed a trespass in entering Grollnek's office on January 22d and installing a microphone and wiring therein, that this trespass was a violation of Grollnek's constitutional rights, and hence the evidence obtained by such lawless conduct was inadmissible. (Citing *People* v. *Martin,* 45 Cal.2d 755 [290 P.2d 855].)

▇ The People contend that defendants cannot be heard to claim error in the admission as evidence of the tape-recorded record. They direct our attention to questions propounded by the district attorney to Officer Bishonden respecting conversations he may have had with Kempner at the time he obtained from Kempner a key to room 1021. He was asked whether he had discussed rooms 1017-1018 with Kempner. An objection was made upon the ground of hearsay and it was

sustained. The district attorney did not make a statement as to his purpose in asking the question nor did he make a statement as to the nature or substance of the testimony he expected to elicit concerning the conversation. The attorney general argues that it was the purpose of the district attorney to prove that Bishonden sought permission from Kempner to enter rooms 1017-1018 and that permission was granted. Therefore he says that the People were prevented from proving that the officers had permission of the building manager to enter the premises and that by their objection defendants lost their right to claim that the entry was illegal. *People* v. *Boyles*, 45 Cal.2d 652, 656 [290 P.2d 535], is cited in support of this contention. The case is not in point. There the defendant by her objections prevented the prosecution from introducing evidence respecting the officers' reasons for believing a felony was being committed at the time of the arrest, the sufficiency of which reasons was for the court to determine.

█ In the absence of evidence to the contrary it will be presumed that an entry of private premises by police officers was made in a legal manner. (*People* v. *Kelsey*, 140 Cal.App. 2d 722 [295 P.2d 462].) But that presumption cannot be given effect in the present case. The officers picked the lock of room 1017 which was Grollnek's outer room. It would be absurd to assume that the district attorney intended to prove that Grollnek gave Kempner permission to allow police officers or anyone else to gain entrance to his jewelry establishment by picking the lock and that Kempner gave the officers permission to enter by that means. Common sense dictates that if Kempner had given permission to the officers to enter the room he would either have given them a key or opened the door himself. The private premises of strangers are not entered by picking door locks when permission to enter has been given and the presumption that official duty has been properly performed can scarcely be extended to the picking of door locks by police officers. █ We conclude that defendants did not by their objection lose the right to contend that it was serious error for the court to admit the record of statements and conversations picked up by the microphone in room 1018 on the night of January 27th.

The entry of room 1017 was not in violation of the constitutional rights of defendants. They had no right to the possession of Grollnek's offices. The attorney general readily agrees that the exclusionary rule applies to evidence obtained through an unlawful entry of premises of persons other than

the accused. Such was the holding of the court in *People* v. *Martin,* 45 Cal.2d 755 [290 P.2d 855]. In that case, after discussing the rule followed in some of the federal courts to the effect that the exclusionary rule is inapplicable unless the accused himself has been wronged, the court said: ''Thus, the rule of the lower federal courts is based on the theory that the evidence is excluded to provide a remedy for a wrong done to the defendant, and that accordingly, if the defendant has not been wronged he is entitled to no remedy. (*Connolly* v. *Medalie, supra,* 58 F.2d 629, 630.) In adopting the exclusionary rule, however, this court recognized that it could not be justified on that theory (*People* v. *Cahan,* 44 Cal.2d 434, 443 [282 P.2d 905]), and based its decision on the ground that 'other remedies have completely failed to secure compliance with the constitutional provisions on the part of police officers with the attendant result that the courts under the old rule have been constantly required to participate in, and in effect condone, the lawless activity of law enforcement officers.' (44 Cal.2d at 445.) This result occurs whenever the government is allowed to profit by its own wrong by basing a conviction on illegally obtained evidence, and if law enforcement officers are allowed to evade the exclusionary rule by obtaining evidence in violation of the rights of third parties, its deterrent effect is to that extent nullified. Moreover, such a limitation virtually invites law enforcement officers to violate the rights of third parties and to trade the escape of a criminal whose rights are violated for the conviction of others by the use of the evidence illegally obtained against them.'' (See also *People* v. *Gale,* 46 Cal.2d 253, 257 [294 P.2d 13] ; *People* v. *Kitchens, supra,* 46 Cal.2d 260, 264-265 [294 P.2d 21].)

The attorney general seeks to avoid application of this rule, contending that it should not be applied where officers enter upon premises solely for the protection of the owner. But these are not the facts of the case. ■ The entry was not made for the purpose of protecting Grollnek's property. When the microphone was installed on January 22d the officers had no information that a robbery was taking place or was about to take place. They did not expect to find anyone on the premises. Their sole purpose was to obtain evidence at some future time for use against the defendants. The officers had no right to make the entry; the evidence obtained by use of the microphone was illegally obtained and it was error for the court to admit it. We do not doubt that the transcription

of the conversation added materially to the strength of the case of the People. We believe it is not improbable that this evidence was the decisive factor in the finding of guilt of the defendants. The attorney general very properly does not contend that the evidence, if improperly admitted, was not prejudicial. Whether the error requires a reversal is to be determined under the general rule, namely, whether there was a deprivation of a fair trial which amounted to a miscarriage of justice. We understand that is the test to be applied to all errors and irregularities of procedure, including all errors in the admission of evidence, regardless of the particular nature of the evidence which renders it inadmissible.

 We do not believe it was error to receive in evidence the bag of tools belonging to Curren which was found in Stewart's office. The tools were found in the office which was searched at the time of the arrest of Stewart and Jager. The information the officers had received from Curren was sufficient to create a reasonable suspicion that defendants had committed a felony. This justified the arrest and the search of the immediate premises, which was incidental to the arrest (*People* v. *Boyles, supra,* 45 Cal.2d 652; *Willson* v. *Superior Court,* 46 Cal.2d 291 [294 P.2d 36]). It is unnecessary to discuss other grounds of appeal urged by defendants.

The judgment, the order denying motion for new trial or in the alternative to grant defendants' motion in arrest of judgment are reversed.

Wood (Parker), J., and Vallée, J., concurred.

A petition for a rehearing was denied November 27, 1956, and respondent's petition for a hearing by the Supreme Court was denied December 12, 1956. Gibson, C. J., Shenk, J., and Spence, J., were of the opinion that the petition should be granted.