[Crim. No. 7587. In Bank. Jan. 30, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. JOSEPH BARRY SHELTON et al., Defendants and Appellants.

Boags & Worrell and C. V. Worrell for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Lawrence R. Tapper, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, J.—Defendants Joseph Shelton and Margie Victorian appeal from judgments of conviction of possessing heroin in violation of Health and Safety Code, section 11500, and from the order denying their motion for new trial. The appeal from the order denying a new trial is dismissed. (Pen. Code, § 1237.)

Officer Hanks of the Narcotics Division of the Los Angeles Police Department testified that he had investigated defendant Shelton for several years and had received many reports from informants that Shelton was a dealer in heroin. He knew that Shelton had been convicted once of a narcotic charge and had been arrested twice on narcotic charges that did not result in convictions. He had often seen Shelton in "high frequency narcotics areas," and in February 1962 he saw him talking to a known heroin dealer. Officer Hanks talked several times with Eunice Baul, a narcotics user, who told him that Shelton was a dealer in heroin and kept her supplied with it. Officer Grennan, another narcotics officer, had also talked with Baul and had used her information to obtain convictions of narcotic offenders. Officer Hanks always found Baul's information consistent with other information he had.

On March 22, 1962 Officers Hanks and Grennan and two other officers went to an apartment house and showed the

manager a picture of Shelton and described Baul. The manager told the officers that Shelton and Baul were occupying apartment No. 1 and that her husband had seen Shelton hide what he believed to be narcotics in the hallway. She gave the officers two hypodermic needles in a plastic case that she said she found in the hallway over the doorway to apartment No. 1. The officers waited outside the door of the apartment until Baul opened it to leave and then entered the apartment and arrested Shelton and Baul. The officers searched the apartment but found no narcotics or other contraband. They searched Shelton and found a key and a rent receipt for an apartment No. 212. Shelton denied knowledge of the receipt and said that Baul gave it to him. She said that she found it in Shelton's car and told the officers " 'I know he isn't going to take me there. That's where he's got Margie.' " The officers asked her if Shelton had any "junk" there, and she replied, " 'He very well could. He could be using that as a stash pot for some junk.' "

Having ascertained that apartment No. 212 was on West 87th Street, the officers told Shelton they were going to take him there to have the manager identify him. Shelton then admitted that he had rented the apartment the preceding night. Officer Hanks asked Shelton, " '. . . who is in [apartment No. 212] now, Joe?' He says, 'There is no one.' I said, 'Do you have any junk in there?' He says, 'No.' I said, 'How about if we go down and take a look?' He says, 'All right, go ahead.' " The officers took Shelton to apartment No. 212 on West 87th Street and knocked on the door. After some delay defendant Victorian asked who was there. The officers asked Shelton to say it was he, but he refused to do so. Officer Hanks then said, " 'All right, police officer. Open the door right now.' " Victorian opened the door, and Officer Hanks testified that she had a hypodermic needle attached to an eye dropper in her left hand. Both defendants testified that when she opened the door Victorian had no clothing on and had nothing in her hand. The officers arrested Victorian and searched the apartment. They found two balloons containing heroin in a shoe box. The manager testified that the box was not in the apartment when he rented it to defendants the preceding evening. Victorian told the officers that Shelton brought her the two balloons, but she refused to repeat the statement in front of Shelton and later denied that she had made it.

Defendants contend that the trial court erred in overruling

their objection to the introduction of the hypodermic needle and heroin into evidence on the ground that they were obtained in the course of an unlawful search of their apartment. ■ Since the search was made without a warrant, the burden was on the prosecution to show proper justification. (*People* v. *King, ante,* pp. 308, 311 [32 Cal.Rptr. 825, 384 P.2d 153]; *People* v. *Haven,* 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927]; *Badillo* v. *Superior Court,* 46 Cal.2d 269, 272 [294 P.2d 23].) The prosecution not only failed to sustain that burden, but established by the testimony of the arresting officers themselves that there was no justification. The evidence was therefore illegally obtained and should have been excluded.

■ The search cannot be justified as incident to the arrest of defendant Shelton, for he was arrested at the apartment he occupied with Baul approximately 2 miles away. (*People* v. *King, ante,* pp. 308, 311 [32 Cal.Rptr. 825, 384 P.2d 153]; *People* v. *Haven,* 59 Cal.2d 713, 719 [31 Cal.Rptr. 47, 381 P.2d 927]; *Castaneda* v. *Superior Court,* 59 Cal.2d 439, 442 [30 Cal.Rptr. 1, 380 P.2d 641]; *Tompkins* v. *Superior Court,* 59 Cal.2d 65, 67 [27 Cal.Rptr. 889, 378 P.2d 113]; *People* v. *Gorg,* 45 Cal.2d 776, 781 [291 P.2d 469].)

■ The search cannot be justified on the ground that the officers had reasonable cause to believe that Shelton was in possession of narcotics at the West 87th Street apartment. Even if it is assumed that the officers' knowledge of Shelton's narcotics activities, his initial denial of any connection with the apartment, and Baul's statement that " 'He could be using ... [the apartment] as a stash pot for some junk' " constituted reasonable cause to believe that there were narcotics in the apartment, a search without a warrant could be justified only as incident to a lawful arrest therein or pursuant to a valid consent. As the United States Supreme Court stated in *Chapman* v. *United States,* 365 U.S. 610, 613 [81 S.Ct. 776, 5 L.Ed.2d 828, 831], "Until *Agnello* v. *United States,* 269 U.S. 20 [46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409], this Court had never directly decided, but had always assumed, 'that one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein' (*id.,* 269 U.S. at page 32, 46 S.Ct. at page 6 [70 L.Ed. at p. 149, 51 A.L.R. at p. 413]), but that case decided that 'Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant. And such searches are ..., unlawful notwithstanding facts unquestionably show-

ing probable cause.' *Id.*, 269 U.S. at page 33, 46 S.Ct. at page 6 [70 L.Ed. at p. 149, 51 A.L.R. at p. 414]." (See also, *People* v. *Haven,* 59 Cal.2d 713, 720 [31 Cal.Rptr. 47, 381 P.2d 927]; *Castaneda* v. *Superior Court,* 59 Cal.2d 439, 443-444 [30 Cal.Rptr. 1, 380 P.2d 641]; *People* v. *Edgar, ante,* pp. 170, 174 [32 Cal.Rptr. 41, 383 P.2d 449].)

The search cannot be justified on the ground that the officers had reasonable cause to arrest Victorian before they demanded that she open the door. Although the informer Baul apparently knew that Victorian was at the apartment, she did not tell the officers that Victorian was also a user or was involved with Shelton in the narcotics traffic. Thus, even if the officers had reasonable cause to believe that Shelton had narcotics at the apartment, they had no reasonable cause to believe that his possession, if any, was shared with Victorian. Before they demanded that the door be opened, they knew only that a woman was in an apartment where Shelton may have stored narcotics. Such association between a suspect and even a known criminal by itself is not reasonable cause for an arrest and search. (*United States* v. *Di Re,* 332 U.S. 581, 587 [68 S.Ct. 222, 92 L.Ed. 210, 216]; *Johnson* v. *United States,* 333 U.S. 10, 16 [68 S.Ct. 367, 92 L.Ed. 436, 441]; *Tompkins* v. *Superior Court,* 59 Cal.2d 65, 67-68 [27 Cal.Rptr. 889, 378 P.2d 113]; *People* v. *Kitchens,* 46 Cal.2d 260, 263 [294 P.2d 17]; *People* v. *Sanders,* 46 Cal.2d 247, 251 [294 P.2d 10], and cases cited; *People* v. *Boyd,* 173 Cal.App. 2d 537, 539 [343 P.2d 283]; *People* v. *Green,* 152 Cal.App.2d 886, 889 [313 P.2d 955]; *People* v. *Yet Ning Yee,* 145 Cal. App.2d 513, 517 [302 P.2d 616].)

The search cannot be justified on the ground that Shelton consented to it. It is true that one of the officers testified that Shelton responded, "All right, go ahead," when the officer suggested they go to the apartment and take a look. The fact that Shelton was under arrest at the time, however, and his subsequent refusal to assist the officers in gaining access to the apartment establish that his apparent consent was not voluntarily given. (*Castaneda* v. *Superior Court,* 59 Cal.2d 439, 442-443 [30 Cal.Rptr. 1, 380 P.2d 641]; *People* v. *Haven,* 59 Cal.2d 713, 720 [31 Cal.Rptr. 47, 381 P.2d 927]; see also *People* v. *Gorg,* 45 Cal.2d 776, 782, fn. 2 [291 P.2d 469].) Moreover, even if Shelton had voluntarily consented to the search, his consent could not justify the invasion of his joint occupant's privacy that occurred when the officer demanded that the door be opened. (*Tompkins* v.

*Superior Court,* 59 Cal.2d 65, 69 [27 Cal.Rptr. 889, 378 P.2d 113].)

The search cannot be justified on the ground that Victorian voluntarily opened the door and thereby exposed evidence sufficient to justify her arrest and a search incident thereto. ■ ''To protect his right to object to an unreasonable search or seizure a defendant need not forcibly resist an officer's assertion of authority to enter his home or search it or his person [citations], but if he freely consents to an entry or search, or voluntarily produces evidence against himself, his constitutional rights are not violated and any search or taking of evidence pursuant to his consent is not unreasonable. [Citations.] ■ Whether in a particular case an apparent consent was in fact voluntarily given or was in submission to an express or implied assertion of authority, is a question of fact to be determined in the light of all the circumstances." *(People* v. *Michael,* 45 Cal.2d 751, 753 [290 P.2d 852].) ■ There is no room for doubt in the present case, for the officer candidly testified that he demanded that Victorian "Open the door right now." When he made that demand he had no reasonable cause to arrest Victorian and no right to order the door opened. Since it was opened by virtue of the wrongful assertion of authority *(People* v. *Edgar, ante,* pp. 171, 174 [32 Cal.Rptr. 41, 383 P.2d 449]; *People* v. *Michael,* 45 Cal.2d 751, 753 [290 P.2d 852]), the officers could not rely on what they then saw to justify Victorian's arrest and the search incident thereto. *(People* v. *Haven,* 59 Cal.2d 713, 718 [31 Cal.Rptr. 47, 381 P.2d 927]; *Tompkins* v. *Superior Court,* 59 Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113]; *People* v. *Brown,* 45 Cal.2d 640, 643-645 [290 P.2d 528].)

The right to seek interviews with suspects at their homes *(People* v. *Martin,* 45 Cal.2d 755, 761 [290 P.2d 855]; *People* v. *Michael,* 45 Cal.2d 751, 754 [290 P.2d 852]) does not include the right to demand that a suspect open his door.

A suspect has no duty to cooperate with officers in securing evidence against him, and in the absence of probable cause to make an arrest, he is entitled to have a magistrate determine whether there is justification for invading the privacy of his home. *(People* v. *Edgar, ante,* pp. 171, 175 [32 Cal.Rptr. 41, 383 P.2d 449]; *People* v. *Haven,* 59 Cal.2d 713, 720 [31 Cal.Rptr. 47, 381 P.2d 927]; *Castaneda* v. *Superior Court,* 59 Cal.2d 439, 443 [30 Cal.Rptr. 1, 380 P.2d 641].) Thus, in approving the officers' conduct in seeking interviews in the *Michael* case and the *Martin* case, we were care-

ful to point out out that we were not dealing with inquiries "accompanied with any assertion of a right to enter or search or secure answers" (*People* v. *Michael*, 45 Cal.2d 751, 754 [290 P.2d 852]) or made with a demand "that the door be opened or that [the officers] be admitted." (*People* v. *Martin*, 45 Cal.2d 755, 761 [290 P.2d 855].)

We are not here concerned with the rule that "circumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians or motorists on the streets for questioning." (*People* v. *Mickelson*, 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658].) What we are concerned with is the right of all persons to be free from unreasonable invasions of the privacy of their homes. The right to seek interviews does not justify an officer's intruding himself into a home without consent, either physically (*People* v. *Haven*, 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927]) or by a view of the interior made possible only by a wrongful assertion of authority. (*People* v. *Edgar*, ante, pp. 171, 174 [32 Cal.Rptr. 41, 383 P.2d 449].) "There are many reasons other than guilt of a felony why an occupant of an apartment may not wish himself or others present exposed to the immediate view of a stranger, even if the stranger is a police officer." (*Tompkins* v. *Superior Court*, 59 Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113].)

 The rule that permits a search without a warrant only when it is incidental to a lawful arrest on the premises strikes a balance between the community's interest in law enforcement and its interest in preserving the privacy of homes. It cannot be extended to permit warrantless searches of other premises where evidence may be found without sanctioning invasions of the privacy of third parties merely because they may have had some association with the person arrested.

" 'The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the peo-

ple's homes secure only in the discretion of police officers. ....
The right of officers to thrust themselves into a home is also a
grave concern, not only to the individual but to a society
which chooses to dwell in reasonable security and freedom
from surveillance. When the right of privacy must reason-
ably yield to the right of search is, as a rule, to be decided by
a judicial officer, not by a policeman or government enforce-
ment agent.' " (*Chapman* v. *United States,* 365 U.S. 610,
614-615 [81 S.Ct. 776, 5 L.Ed.2d 828, 832], quoting from
*Johnson* v. *United States,* 333 U.S. 10, 13-14 [68 S.Ct. 367, 92
L.Ed. 436, 440].)

The judgments are reversed.

Gibson, C. J., Peters, J., Tobriner, J., and Peek, J., con-
curred.

McCOMB, J.—I dissent.

On March 21, 1962, Shelton and Victorian, the defendants,
rented an apartment on 87th Street in Los Angeles as Mr.
and Mrs. Jones, and they took immediate possession.

Defendant Shelton had been under surveillance for some
time by police officers because of reputed transactions in her-
oin and past arrests on narcotic charges, which, however, had
not resulted in convictions.

Eunice Baul, who occupied an apartment on Western Ave-
nue in Los Angeles with defendant Shelton, had told police
officers about Shelton's narcotic purchases as a dealer and
stated that he was her supplier. In the past she had proved
reliable in giving such information.

On March 22, 1962, the officers went to the Western Ave-
nue apartment house. They spoke with the manager, who told
them which apartment defendant Shelton and Miss Baul oc-
cupied and informed them that some hypodermic needles had
been found hidden over the doorway.

The officers waited outside the apartment door until Miss
Baul opened the door, apparently to leave. They entered and
placed both defendant Shelton and Miss Baul under arrest.

The officers searched defendant Shelton and found a rent
receipt for the 87th Street apartment. Defendant Shelton
denied knowledge of the receipt, claiming Miss Baul had
given it to him; but Miss Baul said that she found the re-
ceipt in his car and added: "I know he isn't going to take
me there. That's where he's got Margie." When asked
whether defendant Shelton had any "junk" there, Miss
Baul replied, ",,, He could be using that as a stash pot for

some junk." No narcotics were found in the Western Avenue apartment.

The officers immediately investigated the 87th Street apartment and learned that defendant Shelton was living there with a woman.

They told defendant Shelton they would take him there for identification by the manager, and Shelton then admitted that he had rented the apartment.

One of the officers asked defendant Shelton, "Who is there now?" and defendant Shelton said, "No one." The officer asked if he had any "junk" there, and Shelton said, "No." The officer then said, "How about if we go down and take a look," and Shelton replied, "All right, go ahead."

The officers went to the 87th Street apartment with defendant Shelton and knocked on the door. A woman asked who was there. When the officers asked defendant Shelton to respond, he refused.

The officers then announced themselves and demanded that the door be opened. Defendant Victorian opened the door, holding in one hand a hypodermic needle attached to an eyedropper. She was immediately placed under arrest and the apartment searched. Two balloons containing heroin were found in a shoebox. Defendant Victorian told the officers that defendant Shelton had given the balloons to her the preceding night; but she would not repeat the statement before defendant Shelton, and she later denied having made the statement.

This is the sole question to be determined: *Was the incriminating evidence obtained by means of an unlawful search and seizure?*

*No.* Based on information as to defendant Shelton's past narcotics activities, the officers had reasonable cause to arrest him at the Western Avenue apartment in the company of Miss Baul, an admitted user of narcotics allegedly supplied by defendant Shelton. (*People* v. *Boyles,* 45 Cal.2d 652, 656 [9, 8b] [290 P.2d 535].)

It is not unreasonable for officers to seek interviews with suspects or witnesses or to call upon them at their homes for such purposes. (*People* v. *Martin,* 45 Cal.2d 755, 761 [8] [290 P.2d 855]; *People* v. *McGhee,* 196 Cal.App.2d 458, 460 [1] [16 Cal.Rptr. 625].)

In the instant case the police officers had information intimating that defendant Victorian was living with defendant Shelton at the 87th Street apartment; that she might be a

user of narcotics supplied by him, as was the informant, Miss Baul; that as a joint occupant of the apartment defendant Victorian might consent to its search; and that narcotics might be found there.

When defendant Victorian opened the door, she was holding in her hand a hypodermic outfit. (Health & Saf. Code, § 11555.) At this point the officers' information provoking her investigation as a narcotics suspect and the principle of privacy as an individual liberty had to be equated, and it was for the trial court to determine the reasonableness of the officers' action in the light of the factual situation presented to them, having in mind that their judgment must be formed without undue delay and without the benefit of long meditation. (*People* v. *Alcala,* 204 Cal.App.2d 15, 20 [4] [22 Cal. Rptr. 31] [hearing denied by the Supreme Court].)

Under the circumstances, the officers were justified in proceeding with their investigation, entering the 87th Street apartment, and searching there incidental to the arrest of defendant Victorian, who was holding incriminating evidence when they entered.

I would affirm the judgments.

Schauer, J., concurred.