[Crim. No. 3953. Fourth Dist., Div. One. Sept. 8, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JOHN RESS, Defendant and Appellant.

**COUNSEL**

David Horn for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Robert J. Polis, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**WHELAN, J.** — Michael John Ress (defendant) appeals from an order granting probation following his plea of guilty to a charge of possession of marijuana. His motion to suppress evidence under Penal Code section 1538.5 had previously been denied.

At the time he changed his plea to guilty other charges for which he had been bound over were dismissed. They were for conspiracy to pervert and obstruct justice and the due administration of the laws by conspiring to reveal and disclose official information of the San Diego Police Department as protected by Evidence Code section 1040, for possession of restricted dangerous drugs (Health & Saf. Code, § 11910), and for possession of a narcotic (Health & Saf. Code, § 11500).

The evidence sought to be suppressed was that found in a search of defendant's person and of his room on November 14, 1968. The searches were made without a search warrant and defendant's arrest at the same time and place was not under a warrant.

The motion was submitted upon the transcript of testimony at the preliminary hearing and the testimony of defendant at the section 1538.5 hearing.

A motion under Penal Code section 995 to set aside the information was denied at the same time.

### THE EVIDENCE

In the evening hours of November 13, 1968, Fuentes, a state narcotics enforcement agent, and Officer Johnson, of the San Diego police narcotics detail, went to an apartment house at 4023 47th Street in San Diego, where they waited 15 or 20 minutes until they were joined by other San Diego police officers of the narcotics detail, among whom were Donnie McCain and Officer Myrann. Fuentes had with him a warrant to search the premises for narcotics. Janine Cottrell (Cottrell), who lived there, was named as the occupant.

Cottrell came to the door in response to a knock, was informed of the identity of the officers and their possession of a search warrant for the premises, and proceeded to ask a number of questions, during the course of which Fuentes became aware of background noise of movement within the apartment.

The officers forced the door open; through an open window on the west or 47th Street side of the apartment Fuentes observed, on an awning of a

ground floor window immediately below and on the ground below the open window, objects that were retrieved and were found to contain narcotics and restricted dangerous drugs. Fuentes had observed the awning and the area along the west side of the building during his wait for the officers, when those objects were not there.

In the living room a man identified as Stephen Richard Joyce sat at one end of a couch with Cottrell at the other end. In the space between was a sheet of ruled paper on which were written names that Fuentes recognized immediately as those of San Diego police officers on the narcotics detail.

Sergeant Myrann talked to Cottrell at the apartment and later told Sergeant Murray of the narcotics detail that Cottrell had said the list had been brought to the apartment at about 6 p.m. on November 13 by Joyce who had received it from "Mike" who lived on the periphery of the downtown area of San Diego. The first two names on the list were of policemen working undercover. There was a corresponding address and telephone number for each name. Some of the telephone numbers were unlisted in the telephone directory and had recently been assigned. From that and other indicia, Murray concluded the list had been prepared by someone with access to confidential intra-departmental information. On the morning of November 14 the handwriting was compared with that of the written applications for employment of persons with means of access to such information and was found to be like that of James Howard Bovee, a civilian messenger within the police department who had been working there for three or four months.

Bovee was confronted with the written list and denied all knowledge of it until informed that the handwriting had been found to be his. He then stated he had started to make the list on November 13, that it was a finished copy of which earlier drafts were at his home, and which he turned over to Murray. Reluctantly Bovee said he had given the list to Mike on November 13 between 5:30 and 6 p.m.; that Mike was a dealer who was living at 139 Fir Street, in San Diego, and was holding a store of narcotics. Murray was told by Bovee the latter had wished to circulate the list among some of his friends who were involved in narcotics traffic.

Murray had been informed of Joyce's arrest the previous night and that he had been released on bail the same night; Joyce was known to Murray from official records as a man who had served time for an assault upon a policeman and was one of those who had made a sale of narcotics to Rogers, one of the two undercover officers whose names were on the list prepared by Bovee, and Murray had information Joyce was a member of a group one of

whom, Bob Howard, was in custody on a murder charge arising out of the killing of one John Ingle in Tijuana in a dispute involving narcotics.

Murray believed all those matters called for urgency in preventing the further dissemination of possible other copies of the list.

Murray proceeded in the afternoon of November 14 to 139 Fir Street accompanied by Donnie McCain and Officer Yaptango, knocked at the door, which was opened by Mrs. Houghton who with her husband rented the house, identified himself, asked if Mike lived there, was told, "Yes, Mike is in his room," asked if he might enter, was told, "Yes, come in," heard Mrs. Houghton call, "Mike, the police are out here to see you," and was then conducted across the kitchen, into which the outer door opened, into a hall where Murray met defendant about five feet from the door of a room from which defendant came, the doorway of which remained open.

Mrs. Houghton had told Murray that Mike rented a room from her husband and herself and had a right to use the kitchen and connecting hall room.

Murray identified himself to defendant, told him he was investigating a list of narcotics officers that was found in Janine Cottrell's room.

In the course of that explanation, Murray saw an envelope lying on a table in the hall room about 10 feet from the doorway of defendant's room. Murray recognized the envelope as one of those used by the police department for carrying messages and reports within the police department.

Having seen the envelope, Murray advised defendant of the Fifth and Sixth Amendment rights articulated in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and asked defendant if he understood the advice and if, understanding it, he was willing to talk further. Defendant said he understood and was willing to talk.

Defendant said he was given the list at about 6 p.m. of the previous evening when Joyce was present; that he gave the list to Joyce; that he knew Joyce was involved in narcotics and that defendant wanted to circulate the list among some of his friends who were involved in narcotics so that the narcotics officers would be identified to some of the drug users.

Officer Yaptango had been told by Murray that Bovee had said Mike was holding a store of narcotics, and at the house on Fir Street had seen that Mike had come into the hall through an open doorway after Mrs. Houghton had announced the presence of the police. Yaptango could hear voices from the room from which Mike had come; he went to the door, looked in and saw one person, although he had heard the voices of several persons. The full view of the room was not open to him from outside of it, but he

could hear movement of people not within his view so he went into the room to see who was there, but primarily to prevent the destruction by the unseen persons of contraband that he believed was in the room from the information given him by Murray. Having entered, he saw there were three men in the room; he also saw on top of a drawer a small pipe that was too small to be used ordinarily for tobacco smoking and which he recognized as of the kind of which he had seen many used for smoking hashish; he was familiar with the use of such pipes for that purpose, and knew the odor of burned marijuana. He picked up the pipe, smelled it and recognized it smelled of burned marijuana. He then gave it to McCain.

McCain showed the pipe to defendant, told him it was a "hash" pipe, that it smelled of marijuana, that it was illegal to possess a pipe of that kind. McCain had been told by Cottrell the previous evening at her apartment that the list of names had been given to Joyce by "Mike" who lived at the edge of the downtown area; he knew of Joyce's release on bail, and had been told by Murray that a messenger in the police department had told Murray there were narcotics and drugs in Mike's room, to which they were going; he also had seen the envelope found in the hall, and believed defendant was in possession of marijuana; he told defendant he was going to pat him down for weapons and then search his person for narcotics.

McCain did so and defendant pointed out to him a pocket knife in one of his pockets. In patting defendant down McCain found a bulging object in one pocket which to McCain felt like a bag of plastic material containing some yielding substance. He withdrew the bag which contained material that appeared to McCain to be and which was marijuana. McCain then declared defendant to be under arrest.

A search of defendant's room made at the time of his arrest discovered a cardboard box on the bed, which contained clothing, 39 seconal tablets, some seconal capsules, some codeine tablets, and hashish in small cube form wrapped in foil.

## DISCUSSION

■ In discussing the questions presented on this appeal we find the police officers had strong suspicions and possessed the following information before defendant's person was searched:

A list of narcotics officers, including two undercover officers not identified as being police officers except in confidential departmental records, had been prepared by Bovee, a messenger employee, who had access to such records; on November 13, the day on which Bovee completed the list, he delivered it at defendant's residence between 5:30 and 6 p.m. to defendant, whom he described as "Mike," living at Second and Fir Streets; he said

Mike had in his possession a store of narcotics; Joyce, a man who had served time for assaulting a policeman, and who had recently made a sale of narcotics to one of the undercover officers whose name appeared on the list, brought the list to the apartment of Janine Cottrell, who had taken part in a sale of narcotics to the same undercover officer; the police, in executing a warrant to search for narcotics in the apartment of Cottrell on the evening of November 13, found the list, which Cottrell said had been obtained by Joyce from "Mike," who lived at the edge of the downtown area of the city; while the police were seeking to obtain entrance to search under the warrant, occupants of the apartment threw narcotics and restricted dangerous drugs out the window; one of the occupants was Joyce, who was arrested and obtained his release on bail the same night; the information regarding the preparation of the list, its delivery to Mike, Mike's being a dealer and his possession of narcotics was not obtained from the messenger until the morning of the day following discovery of the list in the Cottrell apartment; the messenger admitted having made other copies of the list which he pointed out to Murray at his residence, but denied having given away more than the one delivered to defendant; the action of the messenger was unauthorized and a violation of his duty in his employment.

The following additional information was obtained before the search in the house where defendant lived:

There was an envelope in a hall room about 10 feet from the door of defendant's room that could only have come from the police department and of a kind used only for intra-departmental transmission; defendant stated he received the list from Bovee about 6 p.m. of November 13 in the presence of Joyce, to whom he gave it; he stated also that he knew Joyce was involved in narcotics, and he wanted the list to be circulated among his friends who were involved in narcotics so they could identify the narcotics enforcement officers.

Based upon such information, reasonable inferences could have been drawn, among them being that Joyce would have told defendant of his own arrest the evening before, of the search of the Cottrell apartment, and of the finding of the list, and that the police had been given some information as to the person from whom Joyce had obtained it; that if defendant had narcotics in his possession or had made or received another copy of the list he would act quickly to secrete or destroy them; that Joyce might have been one of the persons in defendant's room unseen prior to Yaptango's entry.

There was thus a connecting web of circumstances to reinforce the reliability of the information so far as it came from Bovee or Cottrell.

Three different but related problems present themselves:

Was the pipe seen by Yaptango in defendant's room the product of a search, and if it was not, was Yaptango's entry justified?

Was there probable cause to arrest him for possession of narcotics if the presence of the pipe in his room be eliminated as an element of probable cause?

The question of the legality of Yaptango's entry into defendant's room must depend upon whether there was at that moment probable cause to arrest defendant upon reasonable suspicion of the commission of any crime. It was only if such cause existed that the protection from destruction of any evidence that might be in the room would make it reasonable to enter. Thus we are thrown back to the question whether such probable cause existed, without which what Yaptango saw in the room only because he entered it could not contribute to probable cause for an arrest upon the existence of which the warrantless search of defendant's person depended.

We are of opinion the information possessed by the police, without considering the seeing and smelling of the hashish pipe, afforded probable cause to arrest defendant for possession of narcotics.

That information was not vague and unidentified as to the origin like that relied upon in *Remers* v. *Superior Court,* 2 Cal.3d 659 [87 Cal.Rptr. 202, 470 P.2d 11]; nor was it based largely upon the fact that the arrest was made in an area known to be frequented by narcotics users as in *Cunha* v. *Superior Court,* 2 Cal.3d 352 [85 Cal.Rptr. 160, 466 P.2d 704].

The information relied upon was positive; although it came from a source that might have been suspect because of Bovee's breach of faith, he was not a paid informer and gave his information reluctantly. That information received considerable strengthening by defendant's admissions corroborating Bovee in the particulars we have listed, and which showed that defendant actively collaborated in the manner described with persons who were involved in narcotic offenses in seeking to thwart possible detection and prosecution of such offenses.

There is no direct corroboration of Bovee's information that defendant had a store of narcotics. There are circumstances that tend to corroborate it. Defendant had a sufficient interest in the protection of those involved in narcotics to commence the circulation of the list of narcotics officers promptly upon receiving it; his declared intention was to enable his friends, who were so involved, to recognize such officers; his messenger for the purpose was Joyce, who had made a sale of narcotics to undercover officer Rogers, and who was arrested in the apartment where the list was found and in which narcotics also were found at the same time.

In other respects Bovee's information was substantiated in the matters we have detailed.

It is stated in *People* v. *Talley,* 65 Cal.2d 830, 837 [56 Cal.Rptr. 492, 423 P.2d 564]: "[W]here, as here, the initial determination of probable cause is made in an adversary proceeding it may be that it is incumbent on the defense to demand further particulars with respect to the informer's information (see 53 Cal.L.Rev. 840, 845-846), and here this was not done."

In the case at bench Bovee was called as a witness by defendant at the preliminary hearing. As a witness Bovee denied he had told Murray that Mike had a store of narcotics; on cross-examination he admitted, however, that he might have obtained drugs from defendant, then said he did not recall whether he had or not; said yes he might have seen defendant use marijuana, amphetamine or lysergic acid; might have seen him use marijuana; had been led to believe defendant was a drug user; had known defendant for three or four months before November 13; had visited defendant in his home; had told Murray he gave the list to a dealer, by which he meant someone who has sold drugs.

The reliability of Bovee's information accepted by the police has thus been substantiated by his direct evidence. A refusal to furnish the name of an informer may result in the dismissal of the proceeding because the defendant, as a result of such refusal, has no opportunity to attack the informer's reliability.

In the present case such after-the-fact inquiry supports the reliability of the information received rather than otherwise.

Murray did not testify Bovee had given specific information that he had on a certain date seen defendant in possession of narcotics at his home.

■ Where there is sufficient substantial corroboration of information received from an informer, that information need not show the underlying circumstances upon which the informer's conclusion was based. (*People* v. *Talley, supra,* 65 Cal.2d 830, 837.)

The question is whether the officers could reasonably rely upon the information under the circumstances. (*People* v. *Lara,* 67 Cal.2d 365, 375 [62 Cal.Rptr. 586, 432 P.2d 202].)

That corroboration of the truthfulness of Bovee's other statements was not solely as to matters irrelevant to the crux of the matter, which was the possession of narcotics, but showed close association with persons in the narcotics trade, and an active interest and positive action to further the continuance of their illegal activities with greater freedom.

■    Although McCain's search preceded the almost concurrent arrest, it was not *ipso facto* illegal. So long as an arrest that follows a search is not sought to be justified by what the search discovers, but rests upon probable cause independent of the search, a search made at the time and place of arrest may precede the arrest. (*People* v. *Boyles,* 45 Cal.2d 652, 655 [290 P.2d 535]; *People* v. *Martin,* 45 Cal.2d 755 [290 P.2d 855].)

■    We conclude that before defendant's person was searched there existed probable cause, independent of the seeing or smelling of the marijuana pipe, to arrest him for possession of narcotics.

The order appealed from is affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.