[Crim. No. 9530.   Second Dist., Div. Two.   Aug. 24, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. DELORES
SAMUELS et al., Defendants and Appellants.

Erling J. Hovden, Public Defender, Irwin H. Garfinkel and James L. McCormick, Deputy Public Defenders, for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and George J. Roth, Deputy Attorney General, for Plaintiff and Respondent.

FOX, P. J.—Defendants were convicted of violating section 11500, Health and Safety Code (possession of heroin). Criminal proceedings were adjourned and the sheriff was ordered to file petitions pursuant to section 6451, Penal Code, to determine whether defendants were narcotic addicts. They were found to be narcotic addicts and were committed to the Director of Corrections as provided by law. Defendants made a motion for a new trial, which was denied. They have appealed from the order denying their motion.

On May 28, 1963, Officer Grennan, a police officer of the City of Los Angeles assigned to the Narcotics Division and who had conducted or participated in several hundred narcotics investigations and was an expert in the use, symptoms and effects of narcotics, received information to the effect that persons known as Janice and Bobby Samuels were living in apartment 1 at 4075 South Broadway and were selling heroin at that location. Approximately a week later (on June 3) Officer Grennan, with his partners, Sergeants Hanks and Flynn, went to the above address at about one o'clock in the afternoon. Officer Grennan had a conversation with the manager of the apartment house who verified that the Samuels were living in apartment 1. The manager stated that there had been numerous people coming to the apartment who would arrive and leave after a short period. This information had significance to the officer. It indicated narcotic traffic. Officer Grennan asked the apartment manager, "Do you know if they [the Samuels] are home now or not?" The manager replied, "Well, wait until I look out front and see if their car is there." She knew their car. It was a 1951 red Ford. She looked out the front door and said, "I don't see the car around

so I don't know if they are home or not." The officer then asked, "Well, would you mind knocking on the door and verifying if they are home or not?" The manager went up and knocked on the door. The officer went along and stood just outside the door jamb approximately a foot and a half from the manager but out of the vision of anyone coming to the door. He could hear everything that was said. Shortly after the manager knocked on the door, a man (Bobby Samuels) came to the door and opened it. The manager said, "Oh, I see you are not dressed. I wanted to talk to you about something. Could you come down to my apartment afterwards?" Defendant said yes, he would be down in a few minutes. This concluded the conversation. The door was closed and the manager went back to her apartment. The officer did not ask the landlady to request either of defendants to come to her office. That was voluntary on the part of the manager. The officer merely asked the manager to verify if the Samuels were home. None of the officers suggested anything to the manager whereby she would induce either of the defendants to come out of their apartment.

Officer Grennan and his partners assumed a vantage point and placed apartment 1 under surveillance. Some 10 or 15 minutes later Bobby came out of the apartment into the hallway that was outside of the Samuels' apartment. This was a public hallway for the use of all occupants of the apartment house. As Bobby stepped out into the hallway and closed the apartment door, Officer Grennan approached him, displaying his badge and identified himself as a police officer. Bobby was outside of his apartment and headed in the direction of the manager's apartment. The officer asked if he was Bobby Samuels and received an affirmative reply. He asked him if he lived in apartment 1, to which Bobby also replied in the affirmative. The officer then inquired if he had ever been "busted" for narcotics, which is slang for having been previously arrested on a narcotics charge. Bobby stated that he had been arrested for "marks" which meant that he had been arrested for illegal use or addiction. Officer Grennan then asked, "How about let's having a look at your arms?" Bobby was wearing clothing that covered his arms. He did not make any audible response. However, he started pushing his sleeves up and displayed his arms to the officers. Upon examining his arms, Officer Grennan observed what appeared to be fresh needle marks on his left forearm. Bobby was then told, "You are under arrest for possession of narcotics."

After the arrest, Bobby was asked if he had a key to his apartment. He inquired of the officers if they had a search warrant. They responded in the negative.

Officer Grennan then went to the manager, obtained a key from her to the Samuels' apartment, opened the door and entered. At the time he obtained the key from the manager, it was his bona fide opinion that this apartment was rented to the Samuels. He entered the apartment by the use of the key without knocking because he wanted to search the apartment before anyone who was inside would have an opportunity to dispose of contraband through the use of toilet facilities. Officer Grennan went into the apartment and back into the kitchen where he observed defendant Delores Samuels standing facing the sink. She was only partially dressed. He identified himself, stating, "Police officers." On top of the sink was a hype outfit (kit) and two balloon fragments, each of which contained a gram of heroin. The kit is used for the injection of heroin into the veins and it, too, contained heroin. Officer Grennan displayed the two balloon fragments to Delores and said, "What about these things?" She replied, "They are mine." He asked if she was using heroin and she said yes. He examined her hands and arms and they bore evidence of recent usage of heroin. The officer then placed her under arrest. In the top left drawer of a bureau located in a small dressing room across from the bath, Officer Grennan found 53 balloon fragments wrapped in yellow tissue. Each of these balloon fragments contained a grain of heroin. On top of the TV in defendants' apartment was a receipt given by the manager for the payment of rent by Bobby for the apartment. After Officer Grennan found the balloons in the bureau, he asked Delores if they were hers and she said yes.

Later at the Police Administration Building, Delores stated to Officer Grennan that Bobby was the boss but she was taking the stuff; that she was saying the contraband was hers because she could do the time better than he. The officers did not have a search warrant or a warrant for the arrest of either of the defendants.

The defendants each contend that the contraband that the officers found was the product of an unlawful search and seizure. Delores makes the additional contention that the officers failed to comply with the provisions of section 844, Penal Code, in that they failed to demand admittance and explain the purpose for which admittance was desired. Penal

Code section 836 provides in pertinent part: "A peace officer may . . . without a warrant, arrest a person: . . . 3. Whenever he has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed." ■ In *People* v. *Ingle,* 53 Cal.2d 407, 412-413, 414 [2 Cal.Rptr. 14, 348 P.2d 577], the court stated the general principles relating to reasonable or probable cause for an arrest without a warrant: ". . . Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. [Citations.] ■ Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt. [Citations.] It is not limited to evidence that would be admissible at the trial on the issue of guilt. [Citation.] The test is not whether the evidence upon which the officer acts in making the arrest is sufficient to convict but only whether the person should stand trial. [Citation.]

". . . . . . . . . . . .

". . . Unless it can be said that prudent men in the position of these officers knowing what they knew and seeing what they did would not have had reasonable cause to believe and to conscientiously entertain a strong suspicion that Ingle was violating or had violated the law, the arrest should be held lawful."

Officer Grennan had received information that pointed the finger of suspicion at the Samuels who assertedly lived in apartment 1 at 4075 South Broadway in Los Angeles. As a means of investigating this clue the officer and his partners went to the apartment house in question. There the manager confirmed the information that the Samuels were actually living in apartment 1. The manager further stated that there had been numerous persons who visited this apartment and left after a short period. To Officer Grennan, an expert in the narcotic traffic, this information indicated that these persons were there to purchase narcotics from defendants. The fresh needle marks that were observed on Bobby's left forearm when he rolled up his sleeves indicated that he had recently received injections of heroin It was at this time when the officers and Bobby were in the hallway just outside of his apartment that he admitted he had previously been arrested for the illegal use of heroin.

The question now is: did Officer Grennan have reasonable cause to arrest Bobby? We have concluded that the trial court was justified in drawing the inference from the facts and circumstances that the officer had reasonable cause to arrest him. Initially, it will be recalled that an informer pointed the finger of suspicion at the Samuels. In pursuit of this lead the officer went to the apartment house indicated and ascertained from the manager that the Samuels not only lived there but that they lived in apartment 1. The manager further disclosed that numerous people had been coming to the apartment and would leave after a brief period. Bobby told Officer Grennan that he had been previously arrested for narcotic addiction. Upon rolling up his sleeves at the officer's request to have a look at his arms, the officer observed fresh needle marks on his left forearm, indicating narcotic injections. To Officer Grennan, trained and experienced in the narcotic traffic, these facts indicated a typical pattern of addicts coming to a source of supply, making their purchases and immediately hurrying off somewhere to have a fix. This justified a reasonable inference, as the trial court impliedly found, that Bobby was very likely to be in possession of heroin and to have it in his apartment. It therefore follows that since the officer had "reasonable cause to believe and to conscientiously entertain a strong suspicion" that Bobby was violating the law, the arrest was properly held to be lawful. As an incident to Bobby's arrest, which was in the hallway just outside of his apartment door, the officers were justified in entering his apartment and making a search thereof for contraband. The heroin thus discovered was therefore admissible in evidence.

Defendant argues that he was illegally tricked into coming out of his apartment and subjecting himself to questioning by the police, relying on *People* v. *Reeves*, 61 Cal.2d 268 [38 Cal.Rptr. 1, 391 P.2d 393]. He bases this argument on the manager's statement when he came to the door in response to her knock that she wanted to talk to him in her office when he got dressed. The factual situation in the instant case is readily distinguishable from that in *Reeves*. In the cited case the officer "asked the manager to telephone Reeves, and to tell him falsely that there was a registered letter from the railroad company at the desk, and that he should come down and get it. The manager made the call at the officer's request, . . ." (P. 271 of 61 Cal.2d.) Here, the police merely requested the apartment manager to ascertain if the Samuels

were in their apartment. It does not appear that they made any suggestion that the manager request Bobby to come to her apartment. That was her own idea. And it will be noted that upon Bobby coming to the door, the officer, although he was in the hallway just outside the door and overheard the conversation between Bobby and the manager, made no effort at that time to either question or arrest him. Thus the facts in the instant case do not justify, and certainly do not require, an inference that the defendant was induced to come out of his apartment by ruse either requested or suggested by the police.

Bobby relies upon *People* v. *Shelton,* 60 Cal.2d 740 [36 Cal.Rptr. 433, 388 P.2d 665]; *People* v. *Haven,* 59 Cal.2d 713, 719 [31 Cal. Rptr. 47, 381 P.2d 927]; *Castaneda* v. *Superior Court,* 59 Cal.2d 439, 442 [30 Cal.Rptr. 1, 380 P.2d 641], and *Tompkins* v. *Superior Court,* 59 Cal.2d 65, 67 [27 Cal.Rptr. 889, 378 P.2d 113], in support of his theory that the search in the instant case could not be justified as an incident to his arrest. His reliance on these cases, however, is misplaced. It will be recalled that in the case at bench Bobby was interrogated and then arrested immediately outside the entrance to his apartment. In each of the cited cases the premises searched were a long distance away from the scene of the arrest. In *Shelton,* for example, the court noted (p. 744) : "The search cannot be justified as incident to the arrest of defendant Shelton, for he was arrested at the apartment he occupied with Baul approximately 2 miles away." The *Haven, Castaneda* and *Tompkins* cases are cited in support of this proposition and properly so, for the premises to be searched in each of these cases were at a substantial distance from where the arrest was made.

It is suggested that the defendant's rolling up his sleeve and exhibiting his arms which disclosed fresh puncture marks was not done freely and voluntarily. This was obviously a question of fact. The undisputed evidence is that upon being requested to let the officer see his arms, he immediately proceeded to push or roll up his sleeve so that the officers could inspect his arms. His action in thus complying with the officer's request reasonably justifies an inference that he did so freely and voluntarily. There is no evidence that would either require or support a finding that his action was not free and voluntary.

The order denying Bobby's motion for a new trial must be affirmed.

APPEAL OF DELORES SAMUELS

▮ Since the officers had reasonable or probable cause to arrest Bobby and to search his adjacent apartment for contraband, the officers were therefore properly and legally in the apartment. Upon their entry they observed Delores at the kitchen sink. There was a hype outfit for taking a fix on the top of the sink and two balloon fragments which contained heroin. When interrogated as to whom these balloon fragments belonged, she said, "They are mine." The officers observed that her hands and arms bore evidence of recent usage of heroin, which use she readily admitted. Really, no actual search was here involved. Apposite here is the statement of the court in *People* v. *Baranko*, 201 Cal.App.2d 189, 195 [20 Cal.Rptr. 139]: "When the officers entered the room they immediately saw defendant at their left talking into a telephone and writing on a piece of scratch pad, and observed on the table several betting markers and a National Daily Reporter for that day. All of the evidence was on top of the table in plain sight of the officers; it was unnecessary for them to, and the officers did not, search the premises to find it. 'To observe that which is open and patent is not a search.' " (Citing *People* v. *Jaurequi,* 142 Cal.App.2d 555 [298 P.2d 896]; *People* v. *Roberts,* 47 Cal.2d 374 [303 P.2d 721].) In the *Roberts* case, the court pointed out (p. 379) that: ". . . in the course of conducting a reasonable search they did not have to blind themselves to what was in plain sight simply because it was disconnected with the purpose for which they entered. (*Love* v. *United States,* 170 F.2d 32 [officers entered the defendant's house lawfully for purpose of searching for another man; in course of search they discovered a distillery in operation]; *Paper* v. *United States,* 53 F.2d 184 [officers entered lawfully for purpose of finding and arresting defendant on one charge; in searching for defendant they discovered an illegal supply of liquor, constituting another offense, in the basement].) The court in the *Paper* case said, 'Where the entry and search are rightful and there is present no element of trespass or fraudulent invasion of the rights of the citizens, there is no reason for excluding evidence of crime discovered in the course of the search. If the officers . . . had discovered in the cellar a counterfeiting plant in operation, would it have been their duty to ignore it? If they had come upon the body of a murdered man, would their testimony as to finding the body be excluded?' [Citation.]

"In formulating the rules governing lawful searches and

seizures the United States Supreme Court has repeatedly recognized the distinction between the seizure of evidence which was readily visible and accessible to the officers and that which was uncovered only after a general, unreasonable ransacking of the premises. [Citations.] The decisions also make a sharp distinction between the seizure of property which is stolen or contraband and property which is inoffending of itself and merely evidentiary. [Citations.]''

Thus the officers, who were legally in the apartment, did not in fact make any search but merely acted upon the presence of the contraband which was on the kitchen sink right before their eyes.

There is no merit in Delores' contention that the entry of the officers was illegal because they failed to comply with the provisions of section 844, Penal Code, in that they failed to demand admittance and explain the purpose for which admittance was desired. In *People* v. *Villanueva*, 220 Cal.App.2d 443 [hear. den.] we considered this question at length (pp. 447-449 [33 Cal.Rptr. 811]). We there pointed out that ''In *People* v. *Maddox*, 46 Cal.2d 301 [294 P.2d 6], the Supreme Court had occasion to interpret section 844. In this case officers had kicked down a door in order to quickly arrest one who they believed was violating the law relative to possession of narcotics. Maddox claimed that his arrest was illegal because the officers did not comply with section 844. The court held that under the circumstances the failure to comply with section 844 did not make the entry or search unreasonable. In the course of the opinion, the court made these observations (p. 306) which are apposite in the instant case: 'Suspects have no constitutional right to destroy or dispose of evidence, and no basic constitutional guarantees are violated because an officer succeeds in getting to a place where he is entitled to be more quickly than he would, had he complied with section 844. Moreover, since the demand and explanation requirements of section 844 are a codification of the common law, they may reasonably be interpreted as limited by the common law rules that compliance is not required if the officer's peril would have been increased or the arrest frustrated had he demanded entrance and stated his purpose. [Citations.] Without the benefit of hindsight and ordinarily on the spur of the moment, the officer must decide these questions in the first instance.' The court further pointed out (pp. 306-307) that if the officer in good faith believes 'that compliance with section 844 is excused, his failure to comply with the formal requirements of

that section does not justify the exclusion of the evidence he obtains.' ''

In the instant case Officer Grennan had conducted or participated in several hundred narcotics investigations and was of course familiar with the technique of disposing of contraband through the toilet facilities. He had reasonable cause to believe that heroin was probably in the apartment. He entered the apartment by the use of the key without knocking and explaining the purpose for which he desired admittance because he wanted to search the apartment before anyone in it had an opportunity to flush the contraband down the toilet, and thus frustrate the search. Under somewhat similar circumstances and for the identical reason the court held in *Maddox* that the evidence seized (there the officers kicked down the door) was admissible although the officers did not comply with section 844.

We also pointed out in *Villanueva* (p. 449) that: ''The principle of Maddox has been consistently followed and represents the current law of this state. (*People* v. *Shelton,* 151 Cal. App.2d 587, 588 [311 P.2d 859] ; *People* v. *King,* 140 Cal.App. 2d 1, 7-9 [294 P.2d 972] ; *People* v. *Sayles,* 140 Cal.App.2d 657, 661 [295 P.2d 579] ; *People* v. *Bookout,* 197 Cal.App.2d 457 [17 Cal.Rptr. 213].) In the latter case, the court noted (p. 463) : 'The appellant asserts that the entry into his house was improper because there was not compliance with section 844 of the Penal Code. It is true that Sergeant Beckman broke open the door without ''having demanded admittance and explained the purpose for which admittance'' was desired. But as said in *People* v. *Shelton,* 151 Cal.App.2d 587, at page 588 [311 P.2d 895] : ''The cases hold that where compliance with this provision would probably frustrate the arrest or permit the destruction of incriminating evidence compliance is not required. [Citations.]'' ' ' ''

We went on to note in *Villanueva* that: ''The *Maddox* case was discussed and quoted in the recent case of *Ker* v. *California,* 374 U.S. 23, 39-40 [83 S. Ct. 623, 10 L.Ed.2d 726, at pp. 741-742], It was held that the *Maddox* interpretation of section 844 violated no principle of the 4th Amendment. Thus the principles of *Maddox* remain unimpaired.''

It therefore follows that the entry of the officers was not illegal by reason of the officers' failure to comply with the provisions of section 844, Penal Code, and that the evidence seized was admissible against both defendants.

The order denying the motion for a new trial is affirmed as to each defendant.

Herndon, J., and Roth, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied October 15, 1964. Mosk, J., did not participate therein. Traynor, C. J., and Tobriner, J., were of the opinion that the petition should be granted.