[Crim. No. 31903. Second Dist., Div. Four. Jan. 2, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLOS MENDOZA, Defendant and Appellant.

**COUNSEL**

Wilbur F. Littlefield, Public Defender, Dennis A. Fischer, John H. Scott and Leighton A. Nugent, Deputy Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Cynthia Sonns Waldman and Paul C. Ament, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ALARCON, J.**—Appellant has appealed the judgment entered upon his plea of guilty to burglary. He seeks review of the order of the trial court denying his motion to suppress made pursuant to Penal Code section 1538.5.

*Factual Background*

On January 19, 1977, at about noon, Los Angeles County Deputy Sheriff Patrick L. Walsh received information from his partner, Deputy Fred Wisinger, that an anonymous person had telephoned a Huntington Park police officer and advised him that the informant's brother was buying heroin at 2421 East Broadway in Huntington Park. The caller also stated he did not like his brother using heroin and would like something done about it. Deputy Walsh and Deputy Wisinger went to 2421 East Broadway to investigate the report. They did not have an arrest or search warrant. The officers were not in uniform and were in an unmarked vehicle. The residence at that address was a single-story structure with a detached garage. A driveway which appeared to be a "normal access route" was located on the east side of the property. It was from the rear of the house to the street. A fence runs from the corner of the house to the garage. There is a gate in the fence. At the rear of the house is an enclosed porch as well as an open porch area. Deputy Wisinger went to the front door of the residence. Deputy Walsh proceeded down the driveway to the rear of the premises. He stopped a short distance from the fence near the garage door. Deputy Walsh stationed himself at that location to contain any persons who might run out the back door or throw anything outside as the result of Deputy Wisinger's knock on the front door and to provide assistance in case there was a violent response.

About 15 seconds after Deputy Wisinger knocked on the front door a 12-year-old Mexican youth "nonchalantly" walked out the open back door to the porch.[1] As the youth started to walk out the open porch door he looked in the direction of Deputy Walsh. Deputy Walsh displayed his badge and identification card and stated he was a deputy sheriff. The youth's eyes opened wide. Deputy Walsh interpreted this change of expression as reflecting pandemonium, panic, anxiety or fright. The youth, while still on the porch, turned immediately and ran back into the house. Believing that the youth might destroy evidence, arm himself, or advise another to do so, Deputy Walsh ran into the house to detain him for investigation. Deputy Walsh testified that he believed that the youth might arm himself or advise others to do so because as a result of his experience as a narcotics officer, he was aware that a large number of narcotics dealers keep weapons on hand because they are "afraid of being ripped off by other people, or for their own protection when they have large sums of money on them."

---

[1]Deputy Walsh testified when he first saw the boy he would have guessed that he was 14 or 15 years old. He later determined that the youth was 12 years old.

Deputy Walsh caught up with the youth in the kitchen which was adjacent to the back porch. The youth then turned and shouted something in Spanish. Deputy Walsh did not understand Spanish. For that reason, Deputy Walsh did not know if he was yelling to someone to destroy evidence or to arm himself. He placed the youth in front of him and peered into the living room and hallway area. He observed another youth, 16 or 17 years old, kneeling in front of an open closet who appeared to be removing or secreting something. Deputy Walsh, fearing that the other youth might be arming himself, displayed his badge, yelled "Sheriffs" and ordered him to "freeze." The second youth immediately stopped what he was doing. Deputy Walsh entered the hallway and approached the second youth and observed in plain view on a dining room table "an ohaus scales, a triple-beam balance scales, a bottle of lactose, some measuring spoons, some tinfoil, . . ." At this time Deputy Walsh admitted his partner into the residence through the front door.

A short time later appellant entered the house through the back door. He asked the officers questions such as: "Hey what are you doing here? I live here. What's going on? What's happening?" Deputy Walsh then displayed his badge and identified himself. Deputy Walsh advised appellant of his *Miranda* rights. Appellant waived his rights. Appellant denied any knowledge of the items which were on the dining room table. Appellant told Deputy Walsh he lived at the residence. He stated that there were no narcotics on the premises. Deputy Walsh informed the appellant of the tip which had been received concerning the sale of heroin at that location. Deputy Walsh then requested permission to search the premises. Appellant consented. Deputy Walsh then advised him he had a right not to grant permission to search. Appellant replied: "There's nothing here. Go ahead and search. Go ahead and search. Go ahead and look."

A search of the premises produced a quantity of controlled substances and narcotics. Following the initial search Robert Godoy arrived at the scene. Deputy Walsh advised him of his *Miranda* rights. Godoy waived his rights. Godoy then admitted that he had purchased five ounces of heroin in Tijuana several weeks earlier and had previously sold two ounces. He stated that the remaining three ounces should have been located in the back yard as a result of the earlier search. Godoy identified the heroin found in the back yard as his. Godoy then pointed out a number of items which he said were stolen or brought to the house by appellant. Appellant's fingerprints were obtained from him on January

21, 1977. These fingerprints matched latent prints obtained in the bedroom of a burglary victim.

*Issue*

■   Appellant contends that the entry of Deputy Walsh into the residence was unlawful and therefore any evidence obtained as a result thereof was inadmissible.

Respondent does not contend that the information known to the officer prior to the entry of the residence constituted reasonable cause for an arrest. Instead, we are asked to affirm the trial court's order on the theory that an officer may enter a residence without a warrant to effect a temporary detention. Our attention has not been directed to any authority which sustains this novel contention.

Based on the tip received from the anonymous person that heroin was being sold from appellant's premises, the officers had a right to seek an interview with individuals present at that location. (*People* v. *Martin* (1955) 45 Cal.2d 755, 761 [290 P.2d 855].) This right does not include entry into a home where a person on the premises chooses not to talk to the officers seeking an interview. (*People* v. *Shelton* (1964) 60 Cal.2d 740, 746 [36 Cal.Rptr. 433, 388 P.2d 665].) "A suspect has no duty to cooperate with officers in securing evidence against him, and in the absence of probable cause to make an arrest, he is entitled to have a magistrate determine whether there is justification for invading the privacy of his home." (*Shelton* at p. 746.) Assuming that under these facts Deputy Walsh had the right to detain the first youth *outside* the premises, he had no right to do so inside the residence without an arrest warrant. Respondent relies heavily on *United States* v. *Santana* (1976) 427 U.S. 38 [49 L.Ed.2d 300, 96 S.Ct. 2406] in support of the proposition that a warrantless entry in a residence may be made in hot pursuit. However, the *Santana* decision is clearly inapplicable since the entry in that matter was made to effect an *arrest,* not a detention.

Before the trial judge, appellant failed to specify the seized items he wished to have suppressed. In his written notice to the court, trial counsel requested suppression of "all evidence seized without a search warrant." This vague description is particularly unenlightening under the facts of this case because various items were seized at different times and places. (See *People* v. *O'Brien* (1969) 71 Cal.2d 394, 401-404 [78 Cal.Rptr. 202, 79 Cal.Rptr. 313, 455 P.2d 138, 456 P.2d 969].) We have determined that the

officer's entry was unwarranted and therefore illegal. Accordingly all evidence which was the fruit of this unlawful intrusion should have been suppressed. Upon remand the trial court will be required to determine which specific tangible or intangible things must be suppressed.

The judgment is reversed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied January 22, 1979.