[No. H000603. Sixth Dist. June 26, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM EUGENE POOLE, Defendant and Appellant.

## COUNSEL

Shelley R. Griffith, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, and Robert R. Granucci, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**BRAUER, J.**—In the court below appellant William Eugene Poole made contemporaneous motions to set aside an information and to suppress evidence (Pen. Code, §§ 995 and 1538.5). His motions were denied, and thereafter he pled guilty to a charge of selling cocaine (Health & Saf. Code, § 11352). His appeal is authorized by the provisions of subdivision (m) of Penal Code section 1538.5, and by *People* v. *Lilienthal* (1978) 22 Cal.3d 891, 897 [150 Cal.Rptr. 910, 587 P.2d 706].)

On appeal Poole contends (1) that the warrantless entry of his apartment by peace officers was unlawful, and (2) that all evidence obtained thereafter—including his own confession—was "fruit of the poisonous tree," and should have been suppressed. A review of the record leads us to agree, and we therefore reverse.

I.

On December 4, 1984, at approximately 5:30 p.m., a military police investigator made a telephone call from Fort Ord to a certain number in Salinas. A man answered the call. After some discussion the man agreed

to sell the investigator two grams of cocaine for $200. The man directed the investigator to drive to a certain 7-Eleven store in Salinas, and told him to call again from there. According to the investigator, the man said "he would have the cocaine delivered to me. He further informed me that he couldn't do it because he was in a wheelchair."

The investigator discussed the call with his chief, and they decided "to effect a control purchase." The chief gave the investigator $200 in cash, and the two then drove to Salinas. There they enlisted the assistance of members of the Salinas Police Department, who acted as surveilling and (ultimately) arresting officers.

A certain apartment 97 was situated "a few hundred feet" away from the 7-Eleven store. The Salinas officers placed both the apartment and the store under close surveillance. About 7:45 p.m., using a telephone booth across the street from the store, the investigator dialed the same number he had called before, and the same man answered. According to the investigator, the man said "his partner was looking out of the window and he could see. He told me he was sending his man over with the cocaine, you know, and he further described the man as being a big guy." Almost immediately after the telephone conversation ended a tall heavy-set man left apartment 97 and headed in the direction of the 7-Eleven store.

The "big guy" subsequently was identified as one Clemon Dixon, Jr. Dixon got into the investigator's car and gave him two bindles of cocaine in exchange for $200. The bindles themselves were of newspaper or magazine paper. The whole transaction took just a few minutes. Just before leaving the car Dixon told the investigator that "[m]y man's name is Billy." Dixon was arrested as he made his way out of the parking lot, and he did not return to apartment 97.[1]

Approximately 15 minutes later,[2] 2 officers went to the front door of apartment 97. They had no warrant of any kind. One of the officers knocked on the door; apparently neither officer said anything. A voice from within said, "Go away." A few minutes later the officers again knocked, and one of them said: "Police Department, open the door. We would like to talk to

---

[1]Dixon originally was charged as a codefendant of appellant Poole. Dixon plays no part in the present appeal.

[2]Detective Robin Stuart of the Salinas Police Department testified that Dixon left apartment 97 "about 1947 or so in the evening" i.e., about 7:47 p.m., and that he entered the apartment "about twenty minutes or so later." The military police investigator testified that Dixon was with him "two, three, four minutes."

you." The door was opened by a person named Michael Cooley. At this point we quote from the record:

"A. Yes, Sir, 'Police Department, open the door. We would like to talk to you.'

"Q. That is when Mr. Michael Cooley opened the door?

"A. Yes, Sir.

"Q. Then you walked in?

"A. Yes, Sir.

"Q. Were there other officers that walked in at that point?

"A. Detective Schloss and I were the first ones into the door and I think within just a very short time after that Sergeant Yoneyama and some others came inside.

"Q. So how many officers went inside the apartment?

"A. I believe when I was talking to the other cops—eventually there must have been six or seven in there, but I can't give you an exact figure.

"Q. You went in and then Detective Schloss right behind you?

"A. Yes, Sir.

"Q. Then all the other officers fall in behind you, is that how it worked?

"A. Within a short time everyone tagged behind, yes, Sir." No one who entered wore a uniform.

Appellant Poole was sitting in his wheelchair in the living room. After all the officers had entered,[3] one of them told Poole that they "suspected narcotic dealings," and asked if they could search his apartment. Once again we quote from the record:

"Q. What did he say?

---

[3]Again we quote from the record:
"Q. It was then after these officers had come in that you talked to Mr. Poole and he gave you his consent to search the apartment, is that right?
"A. Yes, Sir."

"A. He was originally concerned that we might mess the apartment up with our search. Sergeant Yoneyama assured him we would not. He said it was all right with him if we searched his apartment."

While the search was in progress, another officer advised Poole of his *Miranda* rights. Poole said that he understood each of those rights, and waived them. The officer then asked Poole if he had any knowledge of the narcotics transaction at the 7-Eleven store. According to the officer, Poole responded thus: "He advised that he had received a telephone call from a mutual—from a man that they had a mutual friend and he figured he would take a chance. He had a couple of grams left. That is what the man wanted and he agreed to send an associate of his to meet the man with the cocaine."

The searching officers found (1) a balance beam scale, (2) a short straw, (3) a small quantity of marijuana, and (4) a "Jet" magazine which had several squares cut out of its pages. The magazine was seized because, in the words of an officer, "I have observed people to package cocaine in glossy magazine paper similar to the Jet Magazine."

II.

The foregoing facts were adduced at a municipal court hearing which combined a preliminary examination with a motion to suppress evidence. Poole was held to answer. In superior court Poole moved to set aside the information and renewed his motion to suppress evidence. Both motions were denied. In a two-page written decision the superior court conceded that "the police were legally required to obtain a Ramey warrant before effecting the arrest of Defendant Poole." Then the court cited *In re Reginald B.* (1977) 71 Cal.App.3d 398 [139 Cal.Rptr. 465], and quoted from that opinion at some length. (*Id.,* at pp. 403-404.) The court concluded thus: "The Court finds that, after the entry by the police, Defendant Poole gave valid consent to search the residence. The Court further finds that Defendant Poole also waived his constitutional rights and made a statement to the police. The Court finds that the consent and the statement were free and voluntary and did not result from and were not tainted by the technical illegal entry. Defendants' 1538.5 P.C. motion is therefore *denied.*" (Italics in original.)

 Before proceeding further we pause to note that the California Supreme Court has established a "two-step process" for review of a ruling on a motion to suppress evidence. "In the first step the trial court must 'find the facts' relating to the challenged search or seizure: e.g., it must decide what the officer actually perceived, or knew, or believed, and what action he took in response. These are traditional questions of fact, and the

statute vests the superior court with the power to decide them. (Pen. Code, § 1538.5, subd. (i).) . . . [F]or the purpose of finding those facts 'the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence.' [¶] No less important, however, is the second step of the process. . . . 'The trial court also has the duty to decide whether, on the facts found, the search was unreasonable within the meaning of the Constitution.' . . . Because 'that issue is a question of law,' the appellate court is not bound by the substantial evidence standard in reviewing the trial court's decision thereon. . . . [I]t is 'the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness.' . . . On that issue, in short, the appellate court exercises its independent judgment." (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961], fn. omitted; accord, *People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436].)

### III.

■ We agree with the superior court that the officers needed a warrant to enter Poole's apartment, whether they had probable cause or not. "[T]he critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.' That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' [Citation.] In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." (*Payton* v. *New York* (1980) 445 U.S. 573, 589-590 [63 L.Ed.2d 639, 652-653, 100 S.Ct. 1371]; *People* v. *Ramey* (1976) 16 Cal.3d 263, 275-276 [127 Cal.Rptr. 629, 545 P.2d 1333].)

■ No exigent circumstances were shown below, and on appeal the Attorney General does not contend that any existed. Instead, he argues that

the officers entered Poole's apartment with consent. But the record is completely barren of any evidence showing that Poole himself consented to the entry. The apartment door was opened by Michael Cooley, and who was he? The record sayeth not. He may well have been the owner or a co-occupant of the premises, but he may just as well have been a casual visitor, a meter reader, a pizza delivery agent, or an encyclopedia salesman. Whatever his status, the uncontradicted evidence showed that he opened the door in response to a police command. The officers plainly said "open the door." The right to seek interviews with suspects at their homes does not include the right to demand that a suspect open his door. (*People* v. *Shelton* (1964) 60 Cal.2d 740, 746 [36 Cal.Rptr. 433, 388 P.2d 665]; *People* v. *Mendoza* (1979) 87 Cal.App.3d 1008, 1012 [151 Cal.Rptr. 489].)

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." (*Bumper* v. *North Carolina* (1968) 391 U.S. 543, 548-549, fn. omitted [20 L.Ed.2d 797, 802, 88 S.Ct. 1788].) In this case the burden was not discharged, and the superior court correctly labeled the entry as "illegal."

## IV.

██ But we part company with the superior court when it finds that "the consent and the statement . . . did not result from and were not tainted by the technical illegal entry." It is true that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 227 [36 L.Ed.2d 854, 862-863, 93 S.Ct. 2041].) But even a voluntary statement must be rejected if it is the product of illegal police intrusion. (*Florida* v. *Royer* (1983) 460 U.S. 491, 501 [75 L.Ed.2d 229, 238-239, 103 S.Ct. 1319].)

The record shows far more than a mere foot-in-the-door penetration.[4] "Six or seven" officers strode into Poole's apartment in order to "talk" to him, without so much as a by-your-leave. While one court has suggested that "the presence of a large number of officers in an apartment does not present a situation which is per se coercive,"[5] other courts have held to the

---

[4]For examples of "technical" entry, see *People* v. *Patterson* (1979) 94 Cal.App.3d 456, 459 [156 Cal.Rptr. 518]; *In re Reginald B.*, *supra*, 71 Cal.App.3d at page 401; and *In re William C.* (1977) 70 Cal.App.3d 570, 579-580 [138 Cal.Rptr. 843].

[5]*People* v. *Reed* (1975) 393 Mich. 342 [224 N.W.2d 867, 878] [six police officers and three members of crime lab].

contrary.[6] "The knock at the door, whether by day or by night, as a prelude to a search, without authority of law but solely on the authority of the police, did not need the commentary of recent history to be condemned as inconsistent with the conception of human rights enshrined in the history and the basic constitutional documents of English-speaking peoples." (*Wolf* v. *Colorado* (1948) 338 U.S. 25, 28 [93 L.Ed. 1782, 1785-1786, 69 S.Ct. 1359], overruled on another point in *Mapp* v. *Ohio* (1961) 367 U.S. 643, 655-657 [6 L.Ed.2d 1081, 1089-1091, 81 S.Ct. 1684].)

"A search and seizure made pursuant to consent secured *immediately following* an illegal entry . . . is inextricably bound up with the illegal conduct and cannot be segregated therefrom." (*People* v. *Haven* (1963) 59 Cal.2d 713, 719 [31 Cal.Rptr. 47, 381 P.2d 927], italics supplied; accord, *People* v. *James* (1977) 19 Cal.3d 99, 109 [137 Cal.Rptr. 447, 561 P.2d 1135].) In *Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407] "six or seven" federal agents repaired to a certain laundry in San Francisco early in the morning. One of the agents rang the bell, and when a man named Toy responded, the agent said that he was calling for his laundry and dry cleaning. Toy replied that he didn't open until 8 a.m., and told the agent to come back at that time. The agent then identified himself, and Toy slammed the door and started running. The federal officers broke open the door, followed Toy into a bedroom, placed him under arrest and handcuffed him, and then searched the premises. Toy made incriminating statements. The United States Supreme Court held those statements to be inadmissible evidence, saying this: "The Government argues that Toy's statements to the officers in his bedroom, although *closely consequent upon the invasion which we hold unlawful,* were nevertheless admissible because they resulted from 'an intervening independent act of a free will.' This contention, however, takes insufficient account of the circumstances. Six or seven officers had broken the door and followed on Toy's heels into the bedroom where his wife and child were sleeping. He had been *almost immediately* handcuffed and arrested. Under such circumstances it is unreasonable to infer that Toy's response was sufficiently an act of free will to purge the primary taint of the unlawful invasion." (*Id.,* at p. 486, italics added, fn. omitted [9 L.Ed.2d at p. 454].) "Thus, *verbal evidence which derives so immediately from an unlawful entry* and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intru-

---

[6]*United States* v. *Jones* (6th Cir. 1981) 641 F.2d 425, 429 [five armed officers, two with shotguns and others with pistols drawn; "overpowering police presence"]; see also *People* v. *Michael* (1955) 45 Cal.2d 751, 754 [290 P.2d 852] ["appearance of four officers at the door may be a disturbing experience"], and *Little Rock Police Dept.* ex rel. *Munson* v. *One 1977 Lincoln Continental Mark V* (1979) 265 Ark. 512 [580 S.W.2d 451, 452-453] ["several" police officers demanded that defendant open the trunk of his car].

sion." (*Id.,* at pp. 485-486, italics added, fn. omitted [9 L.Ed.2d at p. 452].)

## V.

Miranda warnings will not in themselves purge the taint of prior illegal police conduct. (*Brown* v. *Illinois* (1975) 422 U.S. 590, 601-602 [45 L.Ed.2d 416, 425-426, 95 S.Ct. 2254].) "The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of [illegality]. But they are not the only factor to be considered. The temporal proximity of the [illegality] and the confession, the presence of intervening circumstances, [citation], and, particularly, the purpose and flagrancy of the official misconduct are all relevant. [Citation.] The voluntariness of the statement is a threshold requirement. [Citation.] And the burden of showing admissibility rests, of course, on the prosecution." (*Id.,* at pp. 603-604, fns. omitted [45 L.Ed.2d at p. 427].)

Brown was illegally arrested at gunpoint and taken to a police station where, after being advised of his *Miranda* rights, he made incriminating statements. The United States Supreme Court said this: "[¶] Brown's first statement was separated from his illegal arrest by less than two hours, and there was no intervening event of significance whatsoever. In its essentials, his situation is remarkably like that of James Wah Toy in *Wong Sun.* We could hold Brown's first statement admissible only if we overrule *Wong Sun.* We decline to do so. And the second statement was clearly the result and the fruit of the first. [¶] The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action was 'for investigation' or for 'questioning.' [Citation.] The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." (*Id.,* at pp. 604-605, fns. omitted [45 L.Ed.2d at p. 428].)

In *Dunaway* v. *New York* (1979) 442 U.S. 200 [60 L.Ed.2d 824, 99 S.Ct. 2248], Dunaway was taken into custody (although not formally arrested) by three detectives, driven to police headquarters, and placed in an inter-

rogation room. There he was advised of his *Miranda* rights. Dunaway made statements and drew sketches which incriminated him in the crime of murder. "The first statement was made within an hour after Dunaway reached the police station; the following day he made a second, more complete statement." (*Id.*, at p. 203, fn. 2 [60 L.Ed.2d at p. 830].) Among other things the United States Supreme Court said this: "[¶] The situation in this case is virtually a replica of the situation in *Brown.* Petitioner was also admittedly seized without probable cause in the hope that something might turn up, and confessed without any intervening event of significance. . . . Satisfying the Fifth Amendment is only the 'threshold' condition of the Fourth Amendment analysis required by *Brown.* No intervening events broke the connection between petitioner's illegal detention and his confession. To admit petitioner's confession in such a case would allow 'law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the "procedural safeguards" of the Fifth.'" (*Id.*, at pp. 218-219, fns. omitted [60 L.Ed.2d at p. 840].)

■ Turning to the case before us, we concede that it is factually distinguishable from *Wong Sun, Brown,* and *Dunaway.* For example, no officer broke open a door (*Wong Sun*), and Poole was not forcibly removed from his apartment until after he had made his confession (*Brown* and *Dunaway*). There was no evidence of drawn or exposed weapons. Yet there are *similarities* between this case and the ones we have cited which give us pause. Here Poole's consent to search and his confession were elicited not within an hour or two, but within *minutes* after a flagrantly illegal entry (*Wong Sun, Brown, Dunaway*). We discern no significant intervening circumstances (*Brown, Dunaway*). In our view, Poole was subjected to precisely that sort of "custodial interrogation" condemned in *Dunaway,* even though he himself was not initially seized and transported from his home. He was confined to a wheelchair and surrounded by "six or seven" officers, and it is difficult to believe that he was free to leave (*Dunaway*). Under such circumstances "it is unreasonable to infer that [Poole's] response was sufficiently an act of free will to purge the primary taint of the unlawful invasion" (*Wong Sun*).

Examining "the purpose and flagrancy of the official misconduct" (*Brown*), we note that the manner in which the entry was effected "gives the appearance of having been calculated to cause surprise, fright, and confusion" (*Brown*). But it does more. It also gives the appearance of a deliberate, calculated attempt to circumvent the chore of obtaining a warrant, required by both the United States Supreme Court and its California counterparts. (*Payton* v. *New York, supra,* 445 U.S. 573, 589-590 [63 L.Ed.2d 639, 652-653]; *People* v. *Ramey, supra,* 16 Cal.3d 263, 275-276.) The plan

was patent: instead of trying for a warrant, the officers sought a "consent" entry, a "consent" to search, and a "voluntary" confession. But the United States Supreme Court will not allow the Fourth Amendment to be undermined in this fashion (*Brown, Dunaway*), and neither will we.

## VI.

We think the superior court's reliance upon *In re Reginald B., supra,* 71 Cal.App.3d 398 was misplaced. In that case two officers looking for Reginald B. knocked at the door of a residence. They had no warrant. A boy responded, and the officers asked if Reginald was at home; the boy replied that he was not. The officers then asked if the mother was home; the boy answered that she was; the officers asked if they could speak with her; the boy said "Yes," and then retired within, leaving the door open. One officer stepped "a foot or two inside the door" and was approached by the mother. (*Id.,* at p. 401.) The officer asked if Reginald was at home; the mother pointed to the boy standing in the living room and said "That is Reggie." (*Ibid.*) The boy was taken into custody "on suspicion of robbery and murder." (*Id.,* at p. 402.) On the way to the police station the boy was advised of his *Miranda* rights. At the station he spent about an hour and fifteen minutes in the booking tank and the waiting room. When asked "'if he wanted to talk about it,'" the boy initially replied "'I didn't have nothing to talk about because I didn't do it.'" (*Ibid.*) Subsequently an officer carefully read *Miranda* warnings again, and the boy signed a written waiver. The boy then confessed. (*Ibid.*) Thereafter his attempt to suppress the confession failed, and after a hearing he was committed to the California Youth Authority. He appealed, contending that the confession was the product of an illegal entry and arrest.

The Court of Appeal held that "Officer Prince was *expressly* given consent to enter the residence by an individual who appeared to be a resident and a member of the family." (*Id.,* at p. 403, italics added.) The court went on to say this:

"Here the officers' conduct was not intrusive and no search was conducted. The location of the physical arrest had no effect on the evidence, i.e., the confession which was offered against defendant. Any technical impropriety in arresting the minor in his home rather than the street or elsewhere was certainly attenuated by the officers' scrupulous adherence to the dictates of *Miranda.*" (*Id.,* at p. 404.)

*Reginald B.* is not apposite to this case. Here the officers' conduct *was* intrusive, a search *was* conducted, and the location of the physical invasion

was intimately connected with the evidence secured. As we pointed out in part III, *ante,* there was no consent to enter.

## VII.

The judgment is reversed.

Agliano, P. J., and Chang, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.