Filed 12/1/25  P. v. Matthews CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B333927 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. TA158270 |
| v. | |
| LANCE MATTHEWS, | |
| Defendant and Appellant. | |

APPEAL from an order and judgment of the Superior Court of Los Angeles County, Connie Quinones and Hector E. Gutierrez, Judges.  Affirmed.

Lise M. Breakey, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Lance Matthews of second degree robbery.  The court sentenced him to 25 years to life under the Three Strikes Law.  Matthews appeals.  His court-appointed counsel filed a brief under *People v. Wende* (1979) 25 Cal.3d 436, 441-442.  Matthews submitted his own brief raising a number of issues.  We requested and received additional briefing about one issue.  We affirm the trial court's judgment.  Undesignated statutory citations are to the Penal Code.

## I

We begin with a summary of the facts and pertinent procedural background.

## A

Delorean W. worked as a security guard at a 7-11 store with a Shell gas station.  We follow the parties' and trial court's lead in including only the initial of this individual's surname and refer to him by his first name.  One evening, Delorean arrived early to work and sat in his car with the driver's side door open, smoking a blunt, waiting for his 7:00 p.m. shift to begin.

At about 6:45 p.m., a black BMW sedan backed into a spot by the air pump near Delorean.  Delorean saw Matthews get out of the car.  As Matthews passed the rear of the BMW, Delorean saw him get a gun from the trunk and put it in the front pocket of his hoodie.  Matthews approached Delorean with the driver's door between them.  He kept his right hand in his hoodie pocket. Matthews asked Delorean, "Where you from?"  Delorean replied that he did not gang bang.  Matthews then said, "You know what

2

it is.  I need all of that," and pointed at Delorean's jewelry. Delorean could see the outline of the gun in Matthews's pocket. Because he was afraid of being shot, Delorean handed Matthews all of the jewelry he was wearing:  three gold necklaces and ten rings, including his wedding rings.  He also gave Matthews the $20 that was in his wallet, which was sitting in his lap. Matthews said, "I should really pop you."  He then returned to the BMW walking backwards, watching Delorean the whole time. Once in the car, Matthews drove away.

Delorean sat in shock for a few minutes, then tried to follow Matthews, but got caught in traffic.  He did get a picture of the BMW's license plate.  Delorean returned to his workplace and told his coworkers what happened.  He then went home and contemplated bringing his gun to work, but decided against it.  He returned to work.

At around 11:45 p.m., "Abraham," the owner of the 7-11 called the police and reported the robbery.  Officers came to the store and spoke with Delorean.  He told the officers he did not want to testify but eventually told them what had happened. Delorean gave police the BMW's license plate number.

About a week later, Detective Daniel Pearce took over the investigation.  He watched surveillance video at the 7-11. Technical difficulties prevented him from downloading the video, but he recorded it on his cell phone.  The BMW belonged to one Sharon Palmer.  Pearce found a photograph of Matthews matching Delorean's description.  Matthews's neck tattoo was unique.

Police watched Palmer's residence and eventually took Matthews and Palmer into custody.  Delorean identified Matthews as the robber.

Pearce and his partner spoke to Matthews after the field identification. Matthews was in an interrogation room in handcuffs. Matthews asked if he was under arrest, and Pearce said that had yet to be determined. Pearce then read Matthews his *Miranda* rights. Matthews did not refuse to speak to the officers or ask for an attorney.

Pearce asked Matthews about the night of the robbery. Matthews claimed when he pulled into the gas station, Delorean had called out to him. When Matthews approached, Delorean tried to sell him drugs. Matthews said he was not interested, and Delorean appeared agitated. Matthews said the way Delorean was sitting and appeared to be clutching something made Matthews believe Delorean had a gun. Because of this, Matthews simulated a gun in his pocket with his hand. Matthews claimed Delorean gave him the jewelry voluntarily. Matthews told officers he could probably get it back if they released him. He said it had been pawned. At the end of the interview, the officers told Matthews he was under arrest.

B

An information charged Matthews with robbery and possession of a firearm as a felon and alleged four prior convictions for robbery in 1995 and two 2019 convictions for criminal threats and assault with a deadly weapon.

Matthews elected to represent himself and signed a *Faretta* waiver.

After a preliminary hearing at which Pearce, but not Delorean, testified, Judge Julian C. Recana held Matthews to answer on the robbery charge but dismissed the gun possession charge due to insufficient evidence. The prosecutor filed an amended information dropping the possession charge.

4

Judge Teresa P. Magno presided over the pre-trial proceedings. The court appointed stand-by counsel for Matthews.

C

After the parties announced ready for trial, the court assigned them to Judge Hector E. Gutierrez's court for trial. Judge Gutierrez ruled on various motions. Matthews asked Judge Gutierrez to rule that the prosecutor could not mention that Matthews had a gun during the robbery. Judge Gutierrez ruled that it would be proper for the prosecutor to argue Delorean believed Matthews was armed because the prosecutor needed to prove "fear of force" to meet the elements of robbery.

While testifying, Delorean became emotional. When Matthews asked the record to reflect that Delorean was glaring at him during direct examination, Delorean responded, "For the record, I'm finally looking at the man that robbed me." Delorean became increasingly agitated when Matthews questioned him. At one point, Delorean told Matthews to "shut up" and that he was not very smart, for which he apologized to the court. The court noted Matthews's questioning seemed to be egging Delorean on at times.

Near the end of the prosecutor's case, the court asked Matthews what witnesses he would be calling. Matthews stated he wanted to call his investigator and one of the officers who came to the 7-11 the night of the robbery, Andrew Jenkins or Jesse Cota. The court asked Matthews whether he had served subpoenas on the officers. Matthews said he had not. The court asked the prosecutor whether he had them under subpoena, and he said he did not. The court explained to Matthews that it did not have the power to compel the officers to attend if he had not

served them with subpoenas. Matthews asked for a continuance to do so, which the court denied.

Matthews explained to the court he wanted one of the officers to testify to authenticate footage from their body worn cameras. He suggested having his investigator authenticate the footage. The prosecutor objected the investigator had no personal knowledge of the footage and that, in any event, the footage would be hearsay not subject to an exception. The court reviewed a transcript of the footage and agreed. Although Matthews wanted the footage to show that Delorean had not wanted to speak to the officers, none of his statements were inconsistent with his testimony in court.

The jury convicted Matthews of second degree robbery. Matthews requested a bench trial on his priors and aggravating circumstances. The court allowed him a short continuance to prepare.

D

At the next hearing, Matthews argued the court should strike some of his prior strikes. He asserted three of the four 1995 convictions should be stricken because they all arose from a single event or omission. He argued his 2019 convictions should be stricken because he had been misled by that court about how long he would need to remain in prison before he accepted the plea deal.

The trial court found beyond a reasonable doubt that Matthews had suffered each of the six prior convictions alleged by the prosecutor.

The court considered the alleged aggravating factors and found true that Matthews had been armed, he had engaged in violent conduct, he had suffered prior convictions as an adult and

sustained petitions in juvenile delinquency proceedings that are numerous and of increasing seriousness, he had served a prior term in prison and county jail, he had committed the offense while on parole, and he had previously performed unsatisfactorily on parole. (California Rule of Court, Rule 4.421(a)(2), (b)(1), (b)(2), (b)(3), (b)(4), (b)(5).)

The court found the crime did not show a high degree of cruelty, viciousness, or callousness. (California Rule of Court, Rule 4.421(a)(1).)

Matthews then informed the court he intended to move for a new trial, and the court continued the matter.

At the following hearing, the court heard and denied a motion for a trial transcript. The court then turned to Matthews's motion to strike a prior conviction and his motion under *People v. Sumstine* (1984) 36 Cal.3d 909, 923–924.

The court denied the *Sumstine* motion, rejecting Matthews's arguments that a conviction under section 245 did not constitute a strike and that the 2019 conviction was invalid because of the court's alleged misadvisement about Matthews's credit calculation at the time of his plea. The court denied Matthews's motion for a new trial. The court then turned to Matthews's *People v. Romero* (2002) 99 Cal.App.4th 1418 motion. The court noted Matthews was young at the time of the 1995 convictions.

E

Before Judge Gutierrez could pronounce judgment, Matthews gave oral notice that he intended to file a motion under the Racial Justice Act (Stats. 2020, ch. 317, § 1). Matthews agreed with the court's characterization that Matthews "fe[lt]

7

that the court ruling against you is in and of itself evidence of discrimination," as well as the court's "embroilment."

At the prosecutor's suggestion, the court paused the proceedings and transferred the matter to another court. Judge Gutierrez asked the court reporter to prepare a transcript of the portion of the current hearing relating to the Act.

Judge Connie R. Quinones heard Matthews's motion under the Act. Judge Quinones noted that she had received a written motion from Matthews as well as a partial transcript from the previous hearing before Judge Gutierrez. Matthews requested several categories of discovery and a continuance, which Judge Quinones denied. Judge Quinones asked Matthews for the basis of his motion. Matthews responded that he had no specifics to provide because he did not have any transcripts or discovery. Matthews denied he was arguing the court's rulings against him were evidence of its discrimination, but then described the court's rulings and embroilment as the reason he believed the court discriminated against him. He pointed to no specific words or conduct by the court that showed racial bias or animus. Judge Quinones denied Matthews's motion because there was "no specificity," and he had not stated the "how, why, when, and in what way" of how Judge Gutierrez or Judge Magno discriminated against him.

F

The matter returned to Judge Gutierrez's court for judgment and sentencing. The court allowed both sides to address the *Romero* motion. Matthews noted his young age and issues such as homelessness and parental drug use. He also noted the 1995 convictions were remote in time. He argued that he should not be found within the spirit of the Three Strikes

8

Law.  The court went through Matthews's extensive criminal history on the record and found he was not outside the spirit of the Three Strikes Law because he had suffered "serious and violent felonies" and multiple prison terms.  Judge Gutierrez stated he understood he had discretion, but in "this particular case for the court to exercise its discretion and strike the strikes would be contrary to the intent and the spirit of the Three-Strikes Law."  The court noted it could be looked at as an abuse of discretion not to impose the three strikes law given Matthews's history and prior convictions and the court's concern for the safety of the community.  The court sentenced Matthews to 25 years to life under the Three Strikes Law.

Matthew appealed.  This court appointed counsel.  That counsel filed a *Wende* brief stating she had reviewed the record and found no colorable arguments.  Counsel told Matthews he had the right to file his own brief.  Matthews did so, filing a 40-page brief raising several issues.

At our request, counsel provided briefing about Matthews's *Sumstine* claim.

## II

None of the arguments Matthews raises is valid.  We address each below.

### A

Matthews argues the trial court erred in allowing the prosecutor to use Matthews's statement to police because it was the result of an illegal arrest.  Judge Gutierrez held a motion in limine hearing on this issue during trial.  Matthews argues the *Miranda* warning was insufficient because police told him it was still to be determined whether he would be arrested before reading him his rights.  (See *Miranda v. Arizona* (1966) 384 U.S.

9

436.) Matthews cites no authority for this proposition. As Judge Gutierrez stated, the pertinent issue in determining whether *Miranda* warnings are appropriate is whether Matthews was in custody. Judge Gutierrez correctly found Matthews was in custody: he had been detained hours earlier, handcuffed, and taken to the police station. Officers did not tell him he was free to go, subjected him to a field show-up, and then questioned him in an interrogation room. (See *People v. Bejasa* (2012) 205 Cal.App.4th 26, 36 [court looks at totality of circumstances in determining if defendant is in custody].) The police correctly read Matthews his *Miranda* warnings. There was no requirement they tell him the charge or confirm whether he was under arrest.

Matthews also argues his arrest was illegal because the officers did not obtain a warrant before arresting him. This argument is incorrect. Under Section 836(a)(3), a peace officer may arrest a person without a warrant where there is probable cause to believe the person committed a felony. (See also *People v. Zaragoza* (2016) 1 Cal.5th 21, 57 [probable cause exists where the facts known to a police officer would convince a reasonable person that the arrestee had committed a crime].) The officers had probable cause to believe Matthews had committed a felony. The cases Matthews cites about arrests without probable cause or in a person's home are inapposite to his situation. (See *Kaupp v. Texas* (2003) 538 U.S. 626, 633; *Brown v. Illinois* (1975) 422 U.S. 590, 591; *People v. Poole* (1986) 182 Cal.App.3d 1004, 1015-1016.)

B

Matthews argues the trial court erred in denying him the right to present Jenkin's body worn video footage and in doing so violated his constitutional rights.

10

We first note that Matthews's difficulty in presenting this evidence arose from Matthews's failure to follow proper procedure. The court repeatedly warned him, and Matthews acknowledged, that although he was representing himself he would be held to the same standard as an attorney. (*People v. Smith* (1985) 38 Cal.3d 945, 951–952 (*Smith*) [the self-represented are held to the same standard as attorneys].) Matthews did not take the steps necessary to subpoena Jenkins so he could authenticate the video. This fact moots the court's ruling that the video would constitute inadmissible hearsay, for an unauthenticated video is inadmissible whether or not it is hearsay.

C

Matthews makes a general assertion that the court erred in denying him the right to an investigator and investigative services. He argues this hindered his ability to prepare for trial.

The record shows the courts granted Matthews an investigator and funds. When Matthews reported issues accessing the funds and contacting the investigator, the court did what it could to help, including calling the sheriff's department and investigator and ordering the prosecutor to contact the investigator. It ordered the investigator to court to clarify his role.

Matthews declared ready for trial. There is no reason to believe that, if he had asked the court for more time to connect with his investigator, the court would have denied this request. The court denied continuance requests only after trial began and for particular issues for which Matthews showed no due diligence. The court acted properly.

D

11

Matthews claims the court denied him the right to compel the attendance of witnesses at trial. This is inaccurate.

Matthews's argument appears to be based on his misunderstanding of certain of the court's statements. Just before voir dire, the court asked Matthews what witnesses he intended to call so they could be added to the list to be read to the jurors. Matthews stated he would call Officer Jesse Cota, Officer Mamrot, and Abraham. The court noted the officers were already on the witness list because the prosecutor had also identified them as potential witnesses. Matthews apparently took the court's statement to mean he did not need to do anything to ensure these officers would appear for trial.

As noted, courts expect people representing themselves to follow rules of court as an attorney would. (*Smith*, *supra*, 38 Cal.3d at pp. 951–952.) It was incumbent on Matthews to inform himself of what he needed to do to make sure a witness was available for trial. He failed to take those steps. The court did not deny Matthews the right to compel the attendance of witnesses at trial.

Likewise, the court's denial of a continuance to rectify Matthews's error was not erroneous. Matthews presented no good cause for a continuance. (See *Jensen v. Superior Court* (2008) 160 Cal.App.4th 266, 271 [absence of unsubpoenaed witness is not good cause for continuance].) Matthews's failure to follow rules did not constitute good cause. The court's decision did not deprive him of a fair trial.

Matthews argues the prosecutor deliberately misled the judge about material information favorable to Matthews and insinuates witness Jenkins had this information. However, Matthews fails to identify what this material information was.

He offers no basis for believing Jenkins had it, whatever it was.  This contention fails.

E

Matthews repeatedly accused the court of embroilment, generally after the court denied one of his motions. "Embroilment is the process by which a judge surrenders impartiality.  In doing so, the judge becomes a party to the quarrel, involved rather than impartial and losing professional distance.  Once a judge becomes embroiled in a matter, fairness, impartiality, and the integrity of decisions leave the courtroom." (Rothman et al., California Judicial Conduct Handbook (4th ed. 2017) § 2:1, p. 58.)

Judge Gutierrez and Judge Magno displayed no embroilment, favoritism, or bias.

During a hearing, Matthews argued Judge Gutierrez showed embroilment by doing his own research.  Independent legal research by courts is laudable.  (See *Giraldo v. Dep't of Corrections & Rehabilitation* (2008) 168 Cal.App.4th 231, 251.) Courts must apply the law accurately.  This duty can require independent legal research.

Matthews's other examples do not show embroilment. Judge Gutierrez permitted the prosecutor to argue without filing a written brief.  The court also ruled without asking for opposition from the prosecutor.  This conduct was not evidence of embroilment.  Matthews frequently cited California Rule of Court 4.111 for the proposition that the prosecutor should not be allowed to oppose a motion orally, but that rule imposes no such restriction.  Moreover, Judge Gutierrez's understanding of the law allowed him to rule on Matthews's argument without input from the prosecutor.  The court acted properly.

13

## F

Matthews attempted to foreclose mention of a gun throughout the proceedings, claiming the dismissal of the possession charge at the preliminary hearing meant res judicata applied. This argument was in error. As Judge Gutierrez explained, the law required the prosecutor to prove fear of force as an element of the robbery charge. Nothing prevented the prosecutor from doing so with testimony from the victim, who had not testified at the preliminary hearing. As the court explained to Matthews, res judicata did not prevent the prosecutor from asking Delorean to testify truthfully.

## G

Matthews incorrectly argues the trial court erred in denying his *Sumstine* motion.

A *Sumstine* motion allows a defendant to launch a collateral attack on a previous conviction that is being used to enhance a sentence. (*Sumstine*, *supra*, 36 Cal.3d at pp. 918–919.) The defendant alleges the previous conviction is invalid because of a constitutional failing in that proceeding. (*Id.* at pp. 923–924.) Here, Matthews alleges his 2019 conviction was invalid because the court misadvised him about how credits would be calculated pursuant to a proposed plea agreement. Matthews claims the court told him he would be able to receive fifty percent credit. In fact, Matthews says, the Department of Corrections required him to serve eighty percent of his sentence, and he had to file a habeas claim to fix the error.

The problem with this argument is that the court did not misadvise Matthews, as his counsel concedes in the supplemental briefing on this issue. The trial court was correct, counsel admits, that Matthews was eligible to earn credits to reduce his

14

sentence by fifty percent.  Rather, it was the Department that made the error.  Though Matthews argues he was wrongly deprived of his credits, that is not the standard for *Sumstine* relief.  To support his claim that his plea was not intelligent and voluntary, Matthews must point to a misadvisement by the court.  (*In re Mos*er (1993) 6 Cal.4th 342, 350–352 [court's misadvisement about length of parole term could invalidate plea agreement if prejudice shown].)  His failure to do so is fatal to his claim.

H

Matthews argues Judge Quinones imposed the wrong standard in denying his claim under the Racial Justice Act.  There was no error.

When a defendant alleges a violation of the Act, the court determines whether the defendant has made a prima facie showing.  (§ 745, subd. (c).)  In making this determination, the court takes the defendant's allegations as true and then considers if there is a substantial likelihood that a violation in fact occurred; in other words, more than a mere possibility but less than a standard of more likely than not.  (*Id*., subd. (h)(2).)  Courts have described the plausible justification standard as "minimal."  (*People v. Garcia* (2022) 85 Cal.App.5th 290, 296–297.)

Matthews incorrectly argues the court improperly imposed a "heavy" burden on him.  Matthews did not provide facts sufficient to meet the lenient standard.  (*Garcia, supra,* 85 Cal.App.5th at pp. 296–297.)  Matthews's claim amounted to:  (1) I am Black, and (2) the judge ruled against me.  This is insufficient.

15

Matthews argues the court made impermissible credibility findings in ruling against him, and also erred in denying him discovery. These arguments are unavailing. Matthews failed to provide any facts requiring a credibility determination or justifying discovery. (*People v. Lawson* (2025) 108 Cal.App.5th 990, 1002 [defendant's "ordinary evidentiary rulings" were not a prima facie showing of a violation of the Act].)

I

Matthews argues the trial court erred in declining to strike some of his prior convictions because his case is not within the spirit of the Three Strikes Law. He contends the court's assertion—that striking some of his convictions would be an abuse of discretion—means it did not understand its discretion. This contention is mistaken. As described above, the court considered the appropriate factors, explicitly noted it had discretion, and found the circumstances of Matthews's particular case required a finding that he was within the spirit of the Three Strikes Law.

Matthews argues the court should have stricken some of his strikes because they related to the same conduct, but cites inapposite rules about sentencing rather than authority about convictions constituting strikes.

Matthews faults the court for failing to consider factors such as his mental health or the amount of time he spent in prison, but he provides no cites to show he put evidence of this kind before the court.

Finally, Matthews complains the court did not explain its rationale but identifies no authority requiring the court to do so.

16

## DISPOSITION

We affirm.

WILEY, J.

We concur:

STRATTON, P. J.

UZCATEGUI, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.